660 A.2d 564

N.E.R.I. CORPORATION, AND JOSEPH NERI, A TAXPAYER, PLAINTIFFS–RESPONDENTS, v. NEW JERSEY HIGHWAY AUTHORITY AND SEVELL'S AUTO BODY, CO., INC., DEFENDANTS–APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued May 17, 1995—Decided July 11, 1995.

Before Judges KING, D'ANNUNZIO and EICHEN.

*William Harla* argued the cause for appellant New Jersey Highway Authority (*DeCotiis, Fitzpatrick & Gluck,* attorneys; *Michael H. Gluck* and *J.S. Lee Cohen,* on the brief).

*William J. Pollinger* argued the cause for appellant Sevell's Auto Body Co., Inc. (*William J. Pollinger, P.A.,* attorneys; *Mr. Pollinger,* of counsel and on the brief).

*Carrie Ferraro* argued the cause for respondents (*Law Offices of Harvey Fruchter,* attorneys; *Ms. Ferraro* and *Harvey Fruchter,* on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

Appellants, New Jersey Highway Authority (Authority) and Sevell's Auto Body Co., Inc. (Sevell) appeal from a summary judgment requiring the Authority to "publicly bid its towing and storage contracts for the Garden State Parkway" and declaring the current contract between the Authority and Sevell "null and void." We now reverse.

The Authority, created by the New Jersey Highway Authority Act, *N.J.S.A.* 57:12B–1 to –26, operates the Garden State Parkway. To facilitate the removal of inoperable vehicles from Parkway property, the Authority contracts with entities to provide towing and road service. For that purpose, the Parkway is divided into fifteen sections. The Authority contracts with one towing operator for each section, giving each contractor the exclusive right to provide towing and road service for that section during the term of the contract. Sevell has had the contract for the section between mileposts 129 and 145.6 for approximately forty years. The Authority does not advertise or publicly solicit

applications for towing contracts upon the expiration of each contract. Rather, the practice is that the contract is automatically renewed if the current service provider has performed adequately and if there are no substantial complaints regarding the service provided. The Authority, in effect, handpicks the towing contractors.

The Authority regulates the prices charged by its towing contractors for towing and road service. *N.J.A.C.* 19:8–2.12. The Authority's regulation of repair services is limited to the requirement that charges for parts and labor "be in accordance with the current edition of Chilton's Labor Guide and Parts Manual." *N.J.A.C.* 19:8–2.12(b)(3). Each towing contractor pays the Authority a percentage of the gross receipts generated by Parkway business. A motorist whose vehicle has broken down on the Parkway may not use a towing service other than the holder of the exclusive contract for that section. The motorist, however, has the option of being towed off the Parkway to the nearest exit or being towed to the contractor's storage/repair area.

Plaintiffs commenced this action seeking a judgment terminating the most recent contract awarded to Sevell and requiring the Authority to subject the award of towing contracts to public bidding under *N.J.S.A.* 27:12B–5.2 (hereafter § 5.2).

Section 5.2 provides:

a. The New Jersey Highway Authority, in the exercise of its authority to make and enter into contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers, shall adopt standing operating rules and procedures providing that, except as hereinafter provided, no contract on behalf of the authority shall be entered into for the doing of any work, or for the hiring of equipment or vehicles, where the sum to be expended exceeds the sum of $7,500.00 or, after June 30, 1985, the amount determined pursuant to subsection b. of this section, unless the authority shall first publicly advertise for bids therefor, and shall award the contract to the lowest responsible bidder; provided, however, that such advertising shall not be required where the contract to be entered into is one for the furnishing or performing services of a professional nature or for the supplying of any product or the rendering of any service by a public utility subject to the jurisdiction of the Board of Public Utilities of this State, and tariffs and schedules of the charges made, charged, or exacted by the public utility for any

such products to be supplied or services to be rendered are filed with the said board.

This subsection shall not prevent the authority from having any work done by its own employees, nor shall it apply to repairs, or to the furnishing of materials, supplies or labor, or the hiring of equipment or vehicles, when the safety or protection of its or other public property or the public convenience requires, or the exigency of the authority's service will not admit of such advertisement. In such case the authority shall, by resolution, passed by the affirmative vote of a majority of its members, declare the exigency or emergency to exist, and set forth in the resolution the nature thereof and the approximate amount to be so expended.

■ The Authority makes four contentions. The first contention relies on *N.J.S.A.* 27:12B–14 (hereafter § 14), which provides in relevant part:

The Authority is hereby authorized to fix, revise, charge and collect tolls and charges for the use of each project and the different parts or sections thereof, and to contract with any person, partnership, association or corporation desiring the use of any part thereof, including the right-of-way adjoining a paved portion, for placing thereon telephone, telegraph, electric light or power lines, gas stations, garages, stores, hotels, and restaurants, or for any other purpose except for tracks for railroad or railway use, and to fix the terms, conditions, rents and rates of charges for such use; *provided,* that a sufficient number of gas stations may be authorized to be established in each service area along any project to permit reasonable competition by private business in the public interest; ...

The Authority contends that the towing contracts fall within § 14 and, therefore, that § 5.2's requirement of public bidding does not apply.

This contention is without merit. Section 14 applies to projects which require acquisition of an interest in Authority property, such as by easement, license or lease. *See Walter Reade, Inc. v. Dennis Tp.,* 36 *N.J.* 435, 177 *A.*2d 752 (1962). Section 14 was adopted as part of the original legislation creating the Authority in 1952. P.L.1952, c. 16, § 14. The enactment of § 5.2 in 1968, requiring the bidding of certain contracts, did not affect the narrow focus of § 14. *Cf. Yacenda Food Management Corp. v. N.J. Highway Authority,* 203 *N.J.Super.* 264, 272–73, 496 *A.*2d 733 (App.Div.1985) (holding that § 5.2 applies to a "different type of service" than that covered in § 14).

■ We also reject the Authority's argument that § 5.2 is not applicable to towing contracts because the Authority does not expend funds, but rather, it receives money from the towing contractors. This court rejected the same argument in the context of municipal towing contracts in *Kurman v. City of Newark*, 124 *N.J.Super.* 89, 304 *A.2d* 768 (App.Div.), *certif. denied*, 63 *N.J.* 563, 310 *A.2d* 477 (1973), as our predecessor court did in *McKim v. South Orange*, 133 *N.J.L.* 470, 44 *A.2d* 784 (Sup.Ct.1945).

*Kurman* involved a statute, *N.J.S.A.* 40A:11–4, which requires public bidding for contracts where the price "is to be paid with or out of public funds." We reversed a summary judgment in favor of the city, which had awarded a towing and storage contract without bidding. As in the present case, the owner of a disabled vehicle was responsible for the towing and storage charges. The city expended no funds. This court ruled that the statute and the public policy it manifested required public bidding. We stated:

> The towing and storage of the vehicles is performed under the police power of Newark. If it were to perform the work it would first expend funds before any money would be realized in a reclamation or auction sale. Rather than do the work itself, Newark has elected to contract for the performance of the same, but in such instance *McKim* mandates public bidding. Simply because Newark by virtue of the proposed contract is passing the charge on to the owner, does not alter the basic fact that the work is being performed for Newark by the contractor.
>
> [*Id.* at 93, 304 *A.2d* 768.]

In *McKim, supra*, the court set aside an ordinance authorizing the issuance of one license to collect garbage, where the collector's charges, set by the municipality, were to be paid by each homeowner. Although the municipality would not be expending funds, the court ruled that such a scheme could not be implemented without public bidding. 133 *N.J.L.* at 473–74, 44 *A.2d* 784. *See Pied Piper Ice Cream, Inc. v. Essex County Park Comm.*, 132 *N.J.Super.* 480, 334 *A.2d* 337 (App.Div.1975) (holding that Park Commission could not award the right to sell ice cream at county parks without public bidding, though contractor paid the Park Commission a commission on gross sales and no public funds were expended).

■ The Authority's third contention is that the towing contract falls within § 5.2's exemption of "services of a professional nature." We disagree.

In *Autotote Ltd. v. N.J. Sports & Expo. Auth.*, 85 *N.J.* 363, 427 *A.2d* 55 (1981), the Supreme Court held that a contract for a totalisator system to be installed at the Meadowlands racetrack fell within the professional services exemption in the bidding statute applicable to the New Jersey Sports and Exposition Authority. *N.J.S.A.* 5:10–21. The Court determined that the contract was for professional services because it "involves the inextricable integration of a sophisticated computer system and services of such a technical and scientific nature." *Id.* at 371, 427 *A.2d* 55.

Although the Court in *Autotote* commented that the legislative definitions of professional services in the Local Public Contracts Law, *N.J.S.A.* 40A:11–2, was not helpful, we note that towing service would not qualify as a professional service under that statute. *N.J.S.A.* 40A:11–2(6).[1]

We conclude that towing does not constitute a professional service within the meaning of § 5.2. Although it requires training and experience, the process of towing and preparing the vehicle for towing is indistinguishable from many construction trades whose contracted services must be procured by public bidding.

■ The Authority's final contention is that the towing contract falls within the public convenience exemption contained in § 5.2. Only *Autotote, supra,* has construed that exemption. As previously indicated, in *Autotote* the Supreme Court ruled that the con-

---

[1] "Professional services" means services rendered or performed by a person authorized by law to practice a recognized profession, whose practice is regulated by law, and the performance of which services requires knowledge of an advanced type in a field of learning acquired by a prolonged formal course of specialized instruction and study as distinguished from general academic instruction or apprenticeship and training. Professional services may also mean services rendered in the performance of work that is original and creative in character in a recognized field of artistic endeavor. *N.J.S.A.* 20 R.I. 446, 40A:11–2(6).

tract for a totalisator system came within the professional services exception of the bidding statute applicable to the New Jersey Sports and Exposition Authority. Alternatively, the Court also determined that the totalisator contract was sustainable under the public convenience exemption. The public convenience exemption in *N.J.S.A.* 5:10–21, applicable to the New Jersey Sports and Exposition Authority, utilizes the same language as the public convenience exemption in § 5.2. In applying that exemption to the totalisator contract, the Court stated:

> After the Authority decided on the need to change to a cash/sell totalisator system, it installed Autotote demonstration machines at the Meadowlands in late 1978. As has been noted, however, the demonstration failed, causing great inconvenience and confusion to Meadowlands' patrons.
>
> The Authority was then faced with the necessity of securing a reliable cash/sell totalisator in time for the opening of the September 1979 racing season. Its negotiations with Amtote were on this basis. The TIM 300 system, a proven, operational system containing all the features heretofore mentioned, fulfilled all of the Authority's requirements. It satisfied the need to have the best system available. It was of tried reliability, thereby minimizing possible disruption of the track's operations and the resultant inconvenience and confusion to patrons. Because of its sophistication and efficiency it offered major savings in the cost of track operations and at the same time provided substantial additional revenues. In view of these circumstances, we conclude that, under the "public convenience" exception contained in the statute the Authority was authorized to dispense with public bidding and negotiate a contract for the needed equipment and services.
>
> [*Autotote, supra,* 85 *N.J.* at 372–73, 427 *A.*2d 55.]

In *Autotote*, the critical facts justifying application of the public convenience exception were time constraints, possible disruption of the track's operations, and resulting inconvenience and confusion to patrons.

Justice Pashman wrote a concurring opinion in *Autotote* because he believed "that the majority understates the significance of the public convenience exception in this case." *Id.* at 373, 427 *A.*2d 55. Justice Pashman rejected the suggestion that application of the public convenience exception was dependent on time constraints. *Ibid.* In Justice Pashman's view, the majority's reasoning blurred the distinction between the exigency exception and the public convenience exception. *Id.* at 374, 427 *A.*2d 55. According to Justice Pashman, "the fundamental inquiry must be the public

convenience—that is, how the interest of the public, not that of the governmental entity or any other individual party, will best be served." *Ibid.* He concluded that "the interests of [the public] will be served best if the most reliable totalisator system is used at the track. Reliability is so important to the success of operations at the track, and, hence to the 'public convenience', that selection of the totalisator system in 1978 could not have been subjected to the even limited uncertainties of public bidding." *Ibid.*

There is more to the procurement of towing and emergency road service than assuring that the contractor has the requisite hardware and technical competence. The motorist whose car breaks down on the Garden State Parkway is vulnerable, especially in the late evening or early morning hours. The Parkway is a limited access highway and the motorist is cut off from help except for the assistance provided by the Authority. The motorist is required to depend on the services of a contractor imposed on him or her by the Authority. In those circumstances the opportunity for overreaching and exploitation by the contractor is substantial. Moreover, there is a legitimate concern for the personal security of the stranded motorist. This is a particularly important factor in the selection process because the contractor not only removes the vehicle from the Parkway, either to the nearest exit or to the contractor's garage, but may transport the motorist as well. Under those circumstances, character and integrity are critical elements in the Authority's selection of a towing contractor. Those elements cannot be evaluated exclusively in terms of dollars and cents or financial responsibility, but require subjective judgments by Authority personnel. We are persuaded, therefore, that the rubric of "public convenience" includes considerations of personal security and freedom from anxiety and exploitation. Accordingly, we conclude that the Authority is not required to bid its towing contracts.

We do not arrive lightly at this conclusion. When a government agency virtually hand-picks a contractor, the opportunity for corruption or favoritism is manifest. However, the Legislature has

given independent authorities greater freedom in the awarding of public contracts than it has granted to local governments, *N.J.S.A.* 40A:11–1 to –8, or to the State, *N.J.S.A.* 52:34–6 to –10. The State and local governments do not enjoy a public convenience exemption from public bidding. That exemption has been granted to the Authority in this case, as well as to the New Jersey Sports and Exposition Authority, *N.J.S.A.* 5:10–21, the New Jersey Expressway Authority, *N.J.S.A.* 27:12C–11.1, and the New Jersey Turnpike Authority, *N.J.S.A.* 27:23–6.1.

With regard to local contracting units the Legislature has singled out "towing and storage" contracts as an exception to the bidding requirement in certain limited circumstances. *N.J.S.A.* 40A:11–5(1)(u). In that statute, the exempted contract is defined as:

> [c]ontracting unit towing and storage contracts, provided that all such contracts shall be pursuant to reasonable non-exclusionary and non-discriminatory terms and conditions, which may include the provision of such services on a rotating basis, at the rates and charges set by the municipality pursuant to section 1 of P.L.1979, c. 101 (C. 40:48–2.49). All contracting unit towing and storage contracts for services to be provided at rates and charges other than those established pursuant to the terms of this paragraph shall only be awarded to the lowest responsible bidder in accordance with the provisions of the "Local Public Contracts Law" and without regard for the value of the contract therefor. Each of the aforementioned means of contracting shall be subject to any regulations adopted by the Commissioner of Insurance pursuant to section 60 of P.L.1990, c. 8 (C. 17:33B–47).
>
> *[Ibid.]*

This specific exemption has not been construed in any opinion. *Cf. 426 Bloomfield Ave. Corp. v. City of Newark,* 262 *N.J.Super.* 384, 391, 621 *A.*2d 59 (App.Div.1993) (remanding to trial court for consideration of the application of *N.J.S.A.* 40A:11–5(1)(u)). What is noteworthy, however, is the Legislature's recognition that towing contracts are sufficiently problematic to require the special treatment of an exemption from bidding requirements in certain circumstances. *Cf. G & W, Inc. v. East Rutherford Borough,* 280 *N.J.Super.* 507, 515–16, 656 *A.*2d 11 (App.Div.1995) (noting the disparate views regarding applicability of the local unit bidding statute to towing contracts).

We find support for our conclusion in the Legislature's acquiescence in the Authority's forty-year practice of selecting towing contractors without public bidding, a practice that has continued without legislative interference since the enactment of § 5.2 in 1968. *See Malone v. Fender,* 80 *N.J.* 129, 137, 402 *A.*2d 240 (1979); *Yacenda, supra,* 203 *N.J.Super.* at 274, 496 *A.*2d 733. This history provides significant evidence that the Authority's practice conforms with legislative intent. *Malone, supra,* 80 *N.J.* at 137, 402 *A.*2d 240.

■ Although we conclude that the Authority is not required to bid its towing contracts, we would be remiss if we did not address what we perceive to be flaws in its procedures. The Authority does not advertise the fact that a new contract will be awarded for a particular section of the road. We require that it do so hereafter, and accept and evaluate proposals from competing contractors.

■ We also require the adoption of any relevant objective criteria for the evaluation of applicants for new contracts, such as the nature and extent of required equipment, storage and repair facilities. The advertisement of new contracts and the adoption and publication of the objective criteria will tend to establish a level playing field for all applicants, to the extent that is possible in what we acknowledge is a selection process substantially dependent on the exercise of judgment.

Reversed.