686 A.2d 328

N.E.R.I. CORPORATION, AND JOSEPH NERI, A TAXPAYER, PLAINTIFFS–APPELLANTS, AND CROSS–RESPONDENTS, v. NEW JERSEY HIGHWAY AUTHORITY, DEFENDANT–RE-SPONDENT AND CROSS–APPELLANT, AND SEVELL'S AUTO BODY CO., INC., DEFENDANT–RESPONDENT.

Argued September 9, 1996—Decided December 31, 1996.

224

*Harvey Fruchter* and *Carrie Ferraro* argued the cause for appellants and cross-respondents.

*William Harla* argued the cause for respondent cross-appellant (*DeCotiis, Fitzpatrick & Gluck,* attorneys).

*William J. Pollinger* argued the cause for respondent.

The opinion of the court was delivered by

GARIBALDI, J.

The sole issue presented by this appeal is whether the New Jersey Highway Authority Act, *N.J.S.A.* 27:12B–1 to –26 (the Act), requires the New Jersey Public Highway Authority (Authority) to publicly bid its towing and storage contracts for the Garden State Parkway (Parkway).

I

In 1952, the New Jersey Legislature created the Authority and vested it with the power to build, operate, and maintain a safe and modern highway system. *N.J.S.A.* 27:12B–4. Specifically, the Authority is vested with the power to operate the Parkway. *N.J.S.A.* 27:12B–20. The Legislature also granted the Authority certain enumerated powers. *N.J.S.A.* 27:12B–5. One of those powers is "[t]o make and enter into all contracts and agreements necessary or incidental to the performance of its [the Authority's] duties and execution of its powers under this act." *N.J.S.A.* 27:12B–5(*o*).

Section 14 of the Act enables the Authority to contract with parties "desiring the use of any part" of an Authority project. *N.J.S.A.* 27:12B–14. In 1968, the Legislature amended the Act to require public bidding on all contracts. *N.J.S.A.* 27:12B–5.2. The Legislature declared that the Act, "being necessary for the welfare of the State and its inhabitants, shall be liberally construed to effect the purposes thereof." *N.J.S.A.* 27:12B–24.

II

Most of the facts have been stipulated. The Authority contracts with private entities to provide towing and roadside services to Parkway motorists. Each towing contractor is granted the exclusive right to service one of the Parkway's fifteen "zones" for a five-year period. In return, the Authority acquires a fixed percentage of the tower's fees that are received from motorists. The Authority's most recent Request for Proposal (RFP) entitles the

Authority to the following percentages of the tower's gross receipts:

| | |
|---|---|
| under $12,000.00— | 3% |
| $12,000.00 to $16,000.00— | 4% |
| Over $16,000.00— | 5% |

The Authority regulates the maximum chargeable fees that a tower may charge for roadside assistance and towing services. *N.J.A.C.* 19:8–2.12. If a vehicle requires repair, however, fees for parts and labor are set in accordance with the current edition of Chilton's Labor Guide and Parts Manual. *Ibid.*

A Parkway motorist may not use a towing service other than an authorized contractor. Parkway motorists have the option of being towed to the nearest Parkway exit or to the tower's storage and repair area.

The Authority does not advertise or publicly solicit applications for towing contracts. Prior to 1990, the Authority automatically renewed towing contracts absent any complaints filed with the Authority or the State Police regarding the current towing service provider.

After this action was commenced in 1989, however, the Authority instituted an informal rating system devised by Patricia Mooney, an employee of the Authority. The "Mooney System" was designed to assist the Authority in selecting towing service providers. Under that system, interested towers submitted certain information to the Authority in a formal application. Mooney then evaluated the applications and numerically ranked each prospective tower according to certain criteria, including the availability and quality of the tower's equipment and facilities, recommendations from local police departments, and the tower's experience, safety record, and proximity to the Parkway. The applicant accumulating the greatest number of points was awarded the towing contract.

The "Mooney System" was not, however, flawless. The stated criteria for assigning numerical ranks was inconsistently applied

and new applicants were not investigated. While it is unclear whether Mooney was the only Parkway employee responsible for ranking towers, her direct supervisor reviewed the tally sheets and made any adjustment that he or she deemed necessary. Under both systems of selection, the Executive Director of the Authority ultimately approved and signed all contracts.

In 1994, the "Mooney System" was refined. When towing contracts expire, the Authority now publishes a notice of the "RFP" in three newspapers announcing that the Authority is accepting sealed proposals for towing services. A six-member committee reviews, evaluates, and rates all submitted proposals. Selection criteria include, but are not limited to, the following: reliability, experience, response time, acceptance of credit cards, adequate equipment and personnel to safely handle a variety of traffic and weather conditions, location of storage and repair facilities, security of vehicles towed and stored, and maintenance of adequate liability insurance.

Each category on the evaluation form is assigned points based upon a weighted value and rated on a scale of 1 to 5. The Authority does not, and will not, provide applicants with the weighted value attributed to each category. The scale rating is multiplied by the weighted value to determine the score given by each committee member. An average score is then calculated.

The contractor accumulating the most points and meeting the Authority's qualifications is recommended. The committee then prepares contracts and forwards them to the Executive Director for approval.

Since this competitive evaluation process was established, contracts have been awarded for five zones. Each contract was awarded to the highest scoring contractor satisfying the Authority's qualifications. Of those five contracts, three were awarded to incumbents and two were awarded to new towing contractors.

Sevell's Auto Body Co., Inc. (Sevell), has exclusively provided all roadside and towing services between mile posts 132 and 145.6,

since the Parkway's original opening approximately forty years ago. Because the Authority had first-hand knowledge of Sevell's performance, its contracts were renewed in 1986 and 1991 without formal application. Sevell's present contract expires November 1, 1996.[1]

Plaintiff, Neri Corporation (Neri), provides towing, storage, and auto repair services. Plaintiff, Joseph Neri, is the majority stockholder of Neri. In 1984, Neri submitted a formal application to the Authority, seeking the award of a 1986 towing contract covering the mile posts from 132 to 145.6. Neri's application was rejected, however, in favor of renewing Sevell's existing contract.

In 1989, plaintiffs filed an action against the Authority and the Parkway, seeking to prohibit the Authority from awarding towing licenses without public bidding; to void Sevell's towing contract; to grant the contract to Neri; and to recover attorney's fees.

In 1990, while the Authority was determining the renewal of Sevell's towing contract, it considered but again rejected Neri's 1984 application. Although the 1984 application did not contain current information, Ms. Mooney never contacted Neri for updated data. In 1991, Sevell's towing contract was renewed for a five-year period and the contract remains in effect.

In 1993, plaintiffs filed an amended complaint requesting that the court declare the contract between the Authority and Sevell void; order the Authority to require public bidding for towing contracts; direct the Authority to permit Neri to submit a bid for the contract; and place a one or three-year limit on all towing contracts.

The trial court granted plaintiffs' motion for summary judgment, finding that under *N.J.S.A.* 27:12B–5.2 all Parkway towing and storage contracts are subject to public bidding. Because the

---

[1] On October 1, 1996, the Court granted plaintiffs' motion to stay all action by the Authority in respect of a new towing contract, including the opening of bids, pending the further Order of the Court.

contract between the Authority and Sevell did not comport with the statute's formal bidding requirements, it was declared void.

The Appellate Division reversed, holding that *N.J.S.A.* 27:12B–5.2 does not require the Authority to publicly bid towing and storage contracts as such agreements fall within the statute's "public convenience" exception. *N.E.R.I. Corp. v. New Jersey Highway Authority*, 282 *N.J.Super.* 460, 468–69, 660 *A.*2d 564 (App.Div.1995). According to the Appellate Division, consideration for the personal safety of motorists justifies application of the "public convenience" exception.

The Appellate Division did, however, order the Authority to accept and evaluate proposals from competing contractors. *Id.* at 470, 660 *A.*2d 564. In addition, the Authority was required to establish a level playing field for all applicants by adopting "relevant objective criteria for the evaluation of applicants for new contracts, such as the nature and extent of required equipment, storage and repair facilities." *Ibid.*

We granted plaintiffs' petition for certification, 143 *N.J.* 323, 670 *A.*2d 1065 (1995), and the Authority's cross-petition for certification, *id.* at 324, 670 *A.*2d 1065, and now reverse and interpret *N.J.S.A.* 27:12B–5.2 to require public bidding for all Parkway towing and storage contracts.

### III

The first question that requires resolution is whether *N.J.S.A.* 27:12B–14 (Section 14) or *N.J.S.A.* 27:12B–5.2 (Section 5.2) controls. The Authority contends that towing contracts fall within section 14, and therefore, section 5.2's public-bidding requirement is inapplicable. Both lower courts disagreed, the Appellate Division finding that section 14 applies only to "projects which require acquisition of an interest in Authority property, such as by easement, license or lease." *N.E.R.I., supra,* 282 *N.J.Super.* at 464, 660 *A.*2d 564. We agree.

In relevant part, section 14 provides:

> The Authority is hereby authorized to fix, revise, charge and collect tolls and charges for the use of each project and the different parts or sections thereof, and to contract with any person, partnership, association or corporation desiring the use of any part thereof, including the right-of-way adjoining a paved portion, for placing thereon telephone, telegraph, electric light or power lines, gas stations, garages, stores, hotels, and restaurants, or for any other purpose except for tracks for railroad or railway use, and to fix the terms, conditions, rents and rates of charges for such use; provided, that a sufficient number of gas stations may be authorized to be established in each service area along any project to permit reasonable competition by private business in the public interest....
>
> [*N.J.S.A.* 27:12B–14.]

Section 14 was adopted as part of the original legislation creating the Authority in 1952. *L.* 1952, *c.*16, § 14. It is narrow in scope and only applies to an enumerated list of projects or for other purposes requiring an acquisition of an interest in Authority property. *See Yacenda Food Mgmt. Corp. v. New Jersey Highway Auth.,* 203 *N.J.Super.* 264, 274, 496 *A.*2d 733 (App.Div.1985) (holding section 14 authorizes Authority to enter into restaurant service contracts); *Walter Reade Inc., v. Dennis Tp.,* 36 *N.J.* 435, 438, 177 *A.*2d 752 (1962) (stating section 14 authorizes Authority to "place on the [Parkway] project" physical entities such as gas stations and restaurants).

### Section 5.2 provides:

> The New Jersey Highway Authority, in the exercise of its authority to make and enter into contracts and agreements necessary or incidental to the performance of its duties and the execution of its powers, shall adopt standing operating rules and procedures providing that, except as hereinafter provided, no contract on behalf of the authority shall be entered into for the doing of any work, or for the hiring of equipment or vehicles, where the sum to be expended exceeds the sum of $7,500.00 or, after June 30, 1985, the amount determined pursuant to subsection b. of this section, unless the authority shall first publicly advertise for bids therefor, and shall award the contract to the lowest responsible bidder; provided, however, that such advertising shall not be required where the contract to be entered into is one for the furnishing or performing services of a professional nature or for the supplying of any product or the rendering of any service by a public utility subject to the jurisdiction of the Board of Public Utilities of this State, and tariffs and schedules of the charges made, charged, or exacted by the public utility for any such products to be supplied or services to be rendered are filed with the said board.
>
> This subsection shall not prevent the authority from having any work done by its own employees, nor shall it apply to repairs, or to the furnishing of materials, supplies or labor, or the hiring of equipment or vehicles, when the safety or

protection of its or other public property or the public convenience requires, or the exigency of the authority's service will not admit of such advertisement. In such case the authority shall, by resolution, passed by the affirmative vote of a majority of its members, declare the exigency or emergency to exist, and set forth in the resolution the nature thereof and the approximate amount to be so expended.

[*N.J.S.A.* 27:12B–5.2.]

The plain language of the sections demonstrates that the Legislature intended section 5.2 to govern the Authority's power to contract in areas separate and distinct from those governed by section 14. Section 14 authorizes the Authority to contract with those seeking use of Parkway *property* for limited purposes, such as installing telephone and electricity lines, or building gas stations and hotels. Conversely, section 5.2 applies to different types of services, such as towing and storage, that do not require an acquisition of an interest in Authority property and are not *specifically* governed by section 14.

## IV

We now examine section 5.2 to determine if it applies to towing contracts. First, we reject the Authority's argument that section 5.2 does not apply because the Authority is not required to expend funds in awarding towing contracts. Thus, the Authority maintains that the risks against which bidding laws tend to protect, such as favoritism and corruption, do not exist.

This same argument was rejected in *McKim v. Village of South Orange,* 133 *N.J.L.* 470, 44 *A.*2d 784 (Sup.Ct.1945). In *McKim,* the court set aside a municipal ordinance that authorized a municipality to contract with a garbage collector. *Id.* at 474, 44 *A.*2d 784. Although the garbage collector obtained payment from municipal homeowners, and not the municipality, the court ruled that public bidding was required. *Id.* at 473–74, 44 *A.*2d 784. The court reasoned:

Splitting the total cost among the property-users by a system that leaves to them no choice but to incur and pay the expense does not alter the fact that in essence an award of public work at a price of many thousands of dollars is being made to a private contractor without competition in bidding.

[*Id.* at 474, 44 *A.*2d 784.]

That rationale has been repeatedly applied by courts interpreting public bidding requirements in the area of municipal contracts. *See Pied Piper Ice Cream, Inc. v. Essex County Park Comm'n,* 132 *N.J.Super.* 480, 485–86, 334 *A.2d* 337 (App.Div.1975) (holding that park commission was bound by compulsory bidding provision for ice cream supply contract); *Schnell v. Township of Millburn,* 127 *N.J.Super.* 155, 159, 316 *A.2d* 708 (App.Div.), *aff'd,* 66 *N.J.* 137, 328 *A.2d* 624 (1974) (requiring municipality to publicly bid contracts for supply of burglar alarm panels); *Kurman v. City of Newark,* 124 *N.J.Super.* 89, 93–94, 304 *A.2d* 768 (App.Div.), *certif. denied,* 63 *N.J.* 563, 310 *A.2d* 477 (1973) (holding towing and storage contract was subject to public bidding requirement).

In *Kurman,* the rationale set forth in *McKim* was applied to the narrow public bidding requirement set forth in the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 to –49. *Kurman, supra,* 124 *N.J.Super.* at 93–94, 304 *A.2d* 768. That statute explicitly requires public bidding, but limits the bidding requirement to situations where "the contract price . . . is to be paid with or out of *public funds." N.J.S.A.* 40A:11–4 (emphasis added). *Cf. N.J.S.A.* 27:12B–5.2 (not limiting the public bidding requirement to contracts paid out of public funds).

The Appellate Division in *Kurman* examined the applicability of the public bidding requirement in a statute authorizing municipalities, such as the City of Newark, to enter into contracts for the towing and storage of abandoned vehicles and vehicles involved in accidents. *Kurman, supra,* 124 *N.J.Super.* at 91, 304 *A.2d* 768. Under that statute, if the owner of a towed vehicle failed to pay the towing bill, the towing contractor could auction the vehicle and keep the amount of the sale proceeds needed to pay the towing bill; any excess proceeds would become the property of Newark. *Id.* at 91–92, 304 *A.2d* 768. The court found that the public bidding requirement applied to Newark even though Newark expended no public funds, reasoning:

> The towing and storage of the vehicles is performed under the police power of Newark. If it were to perform the work it would first expend funds before any money would be realized in a reclamation or auction sale. Rather than do the work

itself, Newark has elected to contract for the performance the same.... [P]assing the charge on to the owner[ ] does not alter the basic fact that the work is being performed for Newark by the contractor.

[*Id.* at 93, 304 *A*.2d 768.]

The panel concluded: "Statutes calling for public bidding are for the benefit of the taxpayers and not the bidders [and] should be construed with sole reference to the public good and rigidly adhered to by the court to guard against favoritism, improvidence, extravagance and corruption." *Id.* at 94, 304 *A*.2d 768 (citation omitted).

We adopt the logic of the above line of cases in rejecting the Authority's argument that section 5.2 does not apply. If a private contractor supplies the emergency roadside service that the Authority is required to provide motorists, it is immaterial that the cost of the service is passed directly to the consumer and not paid out of the state treasury; such an arrangement does not alter the fundamental fact that the work is being performed for the Authority. *See Schnell, supra,* 127 *N.J.Super.* at 158–59, 316 *A*.2d 708; *Kurman, supra,* 124 *N.J.Super.* at 93, 304 *A*.2d 768; *McKim, supra,* 133 *N.J.L.* at 474, 44 *A*.2d 784. Moreover, by selecting a tower to service one zone, the Authority is granting that tower a monopoly and the ability to make substantial sums of money not only by providing towing and roadside services, but also by repairing motorists' defective vehicles.

Where the Authority has the decisive voice in the towing contractor selection, the potential for favoritism and corruption exists. Such dangers exist whether sums are expended by the Authority or the members of the public. *See Lill v. Director, Div. of A.B.C., Dept. of Law & Public Safety,* 142 *N.J.Super.* 242, 249, 361 *A*.2d 87 (App.Div.1976) ("Where public officials have the determinative voice in the selection of an exclusive contractor and/or the price which he is to charge, there exists the milieu for favoritism and corruption whether the consideration is paid by the government or the members of the public...."); *see also East Bay Garbage Co. v. Washington Tp. Sanitation Co.,* 52 *Cal.*2d 708, 344 *P*.2d 289, 292 (1959) (holding section of California's Health and

Safety Code, requiring public bidding for public works contracts where the cost exceeds $2,500, applicable where the "district contracts with one of competitor bidding scavenger firms to do the work required, and has the cost of removal of the garbage paid directly to the firm by the inhabitants of the district").

It is a cardinal rule of statutory construction that "the language of a statute should be given its ordinary meaning and construed in a common sense manner to accomplish the legislative purpose." *State v. Pescatore*, 213 *N.J.Super.* 22, 28, 516 *A*.2d 261 (App.Div.1986), *aff'd*, 105 *N.J.* 441, 522 *A*.2d 440 (1987) (citing *In re Barnert Memorial Hospital*, 92 *N.J.* 31, 455 *A*.2d 469 (1983)). The practice of public bidding is universally recognized and deeply embedded in the public policy of this State. *See, e.g., Hillside Tp. v. Sternin*, 25 *N.J.* 317, 322, 136 *A*.2d 265 (1957) (citing *Waszen v. City of Atlantic City*, 1 *N.J.* 272, 283, 63 *A*.2d 255 (1949); *Tice v. Long Branch*, 98 *N.J.L.* 214, 119 *A*. 25 (E. & A.1922)). Public bidding statutes exist for the primary benefit of the taxpayer not the bidder; and must be construed with "sole reference" to the public good and rigidly adhered to by courts to guard against favoritism, improvidence, extravagance, and corruption. *See Kurman, supra*, 124 *N.J.Super.* at 94, 304 *A*.2d 768 (citing *Hillside, supra*, 25 *N.J.* at 322, 136 *A*.2d 265). Thus, it is incumbent on this Court to apply and construct section 5.2 in a manner that furthers, not frustrates, the legislative goals in establishing competitive bidding. *See Young & Co. v. West Orange Redev. Agency*, 125 *N.J.Super.* 440, 443, 311 *A*.2d 390 (App.Div.1973) ("[w]hile the statutory regulations of bidding are to be strictly observed, the application and construction of the statute should be such as to further, not frustrate, the legislative goals in establishing competitive bidding").

We perceive no hardship to the Authority in holding that Parkway towing and storage service contracts require public bidding. On the contrary, we recognize the potential dangers associated with a lack of public bidding in such instances. We also acknowledge the important public interests at stake. "[T]he

citizenry as a whole suffers from providing the opportunity for dishonest or unthinking officials to betray their public trust." *Signacon Controls Inc. v. Mulroy,* 32 *N.Y.*2d ·410, 345 *N.Y.S.*2d 527, 532–33, 298 *N.E.*2d 670, 673 (1973).

V

■ We also reject the Authority's contention that the towing contract falls within Section 5.2's exemption of "services of a professional nature." The term "professional services," is not defined in the Act. The Authority insists that towing and storage services fall within that exception because towing services require "special skill or training."

The Appellate Division properly rejected the Authority's argument. It relied on the definition of professional services in the Local Public Contracts Law, *N.J.S.A.* 40A:11–2, which provides:

> Professional services means services rendered or performed by a person authorized by law to practice a recognized profession, whose practice is regulated by law, and the performance of which services requires knowledge of an advanced type in a field of learning acquired by a prolonged formal course of specialized instruction and study as distinguished from general academic instruction or apprenticeship and training. Professional services may also mean services rendered in the performance of work that is original and creative in character in a recognized field of artistic endeavor.

[*N.J.S.A.* 40A:11–2(6).]

That definition is helpful because it is consistently used by the New Jersey Legislature when defining "professional services" in other statutes. *See, e.g., N.J.S.A.* 17:16C–1(u) (Retail Installment Sales Act); *N.J.S.A.* 18A:18A–2h (Public Schools Contracts Law).

The word "profession" is defined as "[a] vocation or occupation requiring special, usually advanced, education, knowledge, and skill . . . ." *Black's Law Dictionary* 1210 (6th ed. 1990). "The essence of a professional service is that it involves 'specialized knowledge, labor or skills and the labor or skill is predominately mental or intellectual, rather than physical or manual.'" *Baylinson v. Board of Comm'rs.,* 282 *N.J.Super.* 132, 135, 659 *A.*2d 537 (Law Div.1995) (citation omitted); *see also N.J.S.A.* 2A:44A–2 (defining professional services as "performed by a licensed archi-

tect, engineer or land surveyor ... who is not a salaried employee of the contractor"); *N.J.S.A.* 19:44A–3(f) (illustrating professional services as "public relations, research, legal, canvassing, telephone, speech writing"); *N.J.S.A.* 34:1B–7.22 (stating professional services include services of an engineer, inspector, planner, lawyer, financial advisor, bond registrar, or authenticating agent); *N.J.S.A.* 17:16C–1(u) (defining professional services as services rendered by a professional person legally authorized to practice a recognized profession); *N.J.S.A.* 18A:18A–2(h) (same as above).

Other jurisdictions have embraced a similar definition of the term "profession" in similar contexts. *See, e.g., Maryland Casualty Co. v. Crazy Water Co.*, 160 *S.W.*2d 102, 104 (Tex.Civ.App. 1942) (stating labor and skill "involved is predominantly mental or intellectual, rather than physical or manual"); *Abbott v. U.S.*, 138 *Ct.Cl.* 459, 151 *F.Supp.* 929, 932 (1957) (finding profession requires more than an acquired skill); *State Bar of Arizona v. Arizona Land Title & Trust Co.*, 90 *Ariz.* 76, 366 *P.*2d 1, 6 (1961) (defining profession as a "calling in which one professes to have acquired some special knowledge used by way either of instruction or advising others or of servicing them in some art").

The Legislature did not intend towing contractors to be exempt from public bidding. Although a towing contractor must possess special skills to safely perform its services, we find that these skills are not "professional skills" requiring advanced education or special mental or intellectual skills. The skills needed to provide towing and storage services are typically acquired in the course of an apprenticeship or training, rather than a "prolonged formal course of specialized instruction." *N.J.S.A.* 40A:11–2(6).

## VI

An examination of section 5.2 and this Court's analysis in *Autotote Ltd. v. New Jersey Sports & Expo. Auth.*, 85 *N.J.* 363, 427 *A.*2d 55 (1981), discloses that the "public convenience" exception also does not apply. The "public convenience" exception is not defined in the Act and has not been interpreted in any

published opinion other than that of the Appellate Division in this case. However, analogies to other statutory "public convenience" provisions are helpful.

Section 5.2 and its "public convenience" exception are virtually identical to the public bidding laws imposed upon the following entities: New Jersey Sports and Exposition Authority, *N.J.S.A.* 5:10–21.1; New Jersey Expressway Authority, *N.J.S.A.* 27:12C–11.1(a); New Jersey Turnpike Authority, *N.J.S.A.* 27:23–6.1(a); Delaware River Joint Toll Bridge Commission, *N.J.S.A.* 32:8–3.9; New Jersey Building Authority, *N.J.S.A.* 52:18A–78.11(a); and the Water Supply Authority, *N.J.S.A.* 58:1B–22(a). None of these statutes, however, define the term "public convenience."

An analysis of *Autotote, supra,* 85 *N.J.* at 372–73, 427 *A.*2d 55, supports the position that the public convenience exception is not applicable to towing contracts. In *Autotote, supra,* the Sports Authority awarded a three-year contract, commencing September 1976, to Autotote Limited. That contract was for the installation and service of a totalisator system, a complex computer network that tabulates and categorizes the bets made on each horse in each race at a large racetrack. In October 1978, the Sports Authority became aware of an improved and more efficient totalisator system. Autotote was in the process of developing this new system and installed demonstration machines in one of the betting divisions at the racetrack.

Despite Autotote's many attempts to correct a myriad of problems with the system, those machines repeatedly malfunctioned. Sometime between October 1978 and April 1979, the Sports Authority terminated use of Autotote's demonstration machines. In February 1979, the Sports Authority entered into a five-year contract, commencing September 1979, with Amtote, another manufacturer, for a new and more efficient totalisator, the TIM 300 system.

*Autotote, supra,* sought to have the September 1979 contract set aside on the grounds that it should have been subject to the

statutory bidding requirements of *N.J.S.A.* 5:10–21.[2] *Id.* at 365,
427 *A.*2d 55. That public bidding requirement is substantively
identical to the statute involved in the present case. *Compare id.*
at 365–66, 427 *A.*2d 55 (quoting *N.J.S.A.* 5:10–21) with section 5.2.

The Court held that the public convenience exception applied
and that therefore no public bidding was required. *Id.* at 372, 427
*A.*2d 55. In a brief, fact-based analysis, the Court focused on the
highly technical nature of the TIM 300 system and pointed out
that the Sports Authority, when awarding the September 1979
contract to Amtote, was "faced with the necessity of securing a
reliable cash/sell totalisator in time for the opening of the Septem-
ber 1979 racing season." *Ibid.* The Court observed that the TIM
300 was sophisticated, efficient, cost-effective, and "the best sys-
tem available" to the Sports Authority. *Ibid.*

The Appellate Division properly observed the critical facts that
justified application of the public convenience exception in *Auto-
tote:* (1) the high risk of disruption to the entire operation; (2)
resultant inconvenience and confusion to patrons; and (3) time
constraints. *N.E.R.I., supra,* 282 *N.J.Super.* at 467, 660 *A.*2d 564.
None of those factors are present in this case.

Whereas a malfunctioning totalisator system could paralyze a
racetrack, the improper or inefficient removal of a disabled vehicle
from a zone of the Parkway generally would not have such a
devastating effect on the entire Parkway. Nor is the Authority
constrained by time limitations similar to those faced by the
Sports Authority in having to install a totalisator system in time
for the September 1979 opening. The need for towing and
storage services is ongoing and predictable.

The Appellate Division extended the factual circumstances that
justified application of the public convenience exception in *Auto-
tote* to include "considerations of personal security and freedom
from anxiety and exploitation." *Id.* at 468, 660 *A.*2d 564. Accord-

---

[2] *Repealed by L.*1981, *c.* 447, § 7. *See N.J.S.A.* 5:10–21.1 to –21.6.

ing to the Appellate Division, the legitimate concern for the personal safety of the stranded motorist warranted application of the public convenience exception. *Ibid.*

In *Autotote, supra,* we observed that statutory exceptions to public bidding requirements should be "*strictly construed* so as not to dilute this policy or permit a public body to avoid legislative enactments." 85 *N.J.* at 370, 427 *A.*2d 55 (emphasis added). Reading the public convenience exception in a broad manner "would substantially impair the public good safeguarded by competitive public bidding." *Id.* at 381, 427 *A.*2d 55 (Schreiber, J., dissenting). The Appellate Division's approach is unnecessarily broad. The reliability of any contractor to perform nearly any service on the Parkway is always very important for the safety of Parkway patrons. We agree with the trial court's observation that the likelihood of vehicles stalling on the Parkway is predictable:

> To read [the public convenience] exception as applicable as the defendant argues would be in effect to allow the exception to swallow the rule, since the Parkway obviously exists for everyone's convenience and safety and arguably, anything that improves the operation of the Parkway could be said to be a matter of public convenience....

The safety of all who use the Parkway depends, in part, on contractors who salt and plow snow on the Parkway, repair the Parkway's road surface, or clean and collect dead animals on the side of the Parkway. All contractors providing those services must be reliable and render the services adequately. It would be inconsistent with the Legislature's public bidding requirement set forth in section 5.2 to exempt those contracts under the public convenience exception.

## VII

The Legislature addressed the safety concerns of stranded motorists by providing in section 5.2 that the towing contract be awarded to the "lowest responsible bidder." The term "responsible" refers to the bidder's quality, fitness, and capacity to satisfactorily perform the proposed work. *See Arthur Venneri*

*Co. v. Housing Auth. of Paterson,* 29 *N.J.* 392, 403, 149 *A.*2d 228 (1959) (defining "responsibility" within meaning of a statute requiring award of municipal contract to lowest responsible bidder as involving experience, financial ability, facilities necessary to perform contract and moral integrity of bidder); *see also Meadowbrook Carting Co. v. Island Heights Borough,* 138 *N.J.* 307, 313, 650 *A.*2d 748 (1994) (stating "contract must be awarded not simply to the lowest bidder, but rather to the lowest bidder that complies with the substantive and procedural requirements in the bid advertisements and specifications"); *Stano v. Soldo Constr. Co.,* 187 *N.J.Super.* 524, 535, 455 *A.*2d 541 (App.Div.1983) (finding sufficient evidence to cause fair minded and reasonable person to believe that it was not in best interests of municipality to award contract to bidder and therefore sufficient to reject bid on grounds that bidder was not a "responsible bidder" under *N.J.S.A.* 40A:11–16).

Although the financial package offered by the bidder is an important consideration, the bidder must also possess the requisite judgment, skill, ability, and integrity to fulfill its obligations under the public contract. *See City of Inglewood–Los Angeles County Civic Center Auth. v. Superior Court,* 7 *Cal.*3d 861, 103 *Cal.Rptr.* 689, 692, 500 *P.*2d 601, 604 (1972) (defining term "responsible" as trustworthiness, quality, fitness, and capacity of low bidder to satisfactorily perform proposed work). Most jurisdictions adopt a similar construction of the term "responsible" in the public bidding context. *See, e.g., Appeal of Associated Sign & Post,* 485 *N.E.*2d 917, 924 (Ind.Ct.App.1985) (enumerating relevant factors in determining lowest responsible bidder: financial responsibility, capital, character and reputation, competency and efficiency, energy, experience, facilities, faithfulness and fidelity, fraud or unfairness in previous conduct, honesty, judgment, promptness, quality of previous work, and suitability to particular task); *Flynn Constr. Co. v. Leininger,* 125 *Okla.* 197, 257 *P.* 374, 378 (1927) (defining responsible as "[s]kill, responsibility, shortest possible period of time, other things being equal, are the things purchased, paid for with the people's money, and the fewer the dollars with

which the same things may be purchased the better the bargain"); *accord Richland Sch. Dist. v. Central Transp.,* 126 *Pa.Cmwlth.* 658, 560 *A.*2d 885, 888 (1989), *appeal denied,* 525 *Pa.* 648, 581 *A.*2d 574 (1990); *Rollings Constr. v. Tulsa Metro. Water,* 745 *P.*2d 1176, 1178–79 (Okla.1987); *G.A. Branch, Associated Gen. Contractors of America, Inc. v. City of Atlanta,* 253 *Ga.* 397, 321 *S.E.*2d 325, 327 (1984). Other pertinent considerations include the bidder's record for reliability and performance, the bidder's efficiency, and the quality of the bidder's past performance of other contracts and services. *See City of Inglewood, supra,* 500 *P.*2d at 605 n. 5.

 In this case, factors bearing on the "responsibility" of the towing contract bidder may include, but are not limited to, the tower's reliability, experience, availability, quality of equipment and facilities, personnel, and security for towed and stored vehicles. Such factors would become part of the specifications for towers and would assure the motoring public that the towers selected would be competent, reliable and protective of their safety. *William A. Carey & Co. v. Borough of Fair Lawn,* 37 *N.J.Super.* 159, 163, 117 *A.*2d 140 (App.Div.1955) ("The lowest bidder . . . is the one whose bid is not only the lowest for the work to be done but also conforms to the requirements of the notice to bidders.") The responsibility of a bidder is not merely a prerequisite to the award of a contract to the lowest bidder, it carries equal, if not more, weight. Indeed, there are many instances where the "lowest bidders" will not receive the contract because they are not the most "responsible" bidder. In enacting section 5.2, the Legislature intended to base bidding not only on price, but also on the lowest "responsible" price.

As a further condition of bidding, the tower would have to agree to charge the motorist no more than the rates established in *N.J.A.C.* 19:8–2.12. As in other situations where a governmental entity grants an exclusive license to a company to provide services to the public, the fixing of the maximum rate protects the public from unconscionable rates. This is not to say, however, that a tower is precluded from submitting a bid that offers a lower rate

than the maximum permitted by *N.J.A.C.* 19:8–2.12. Such a reduction of rates will benefit motorists.

In view of the plain language of section 5.2, "lowest *responsible* bidder," the strong public policy in this state favoring competitive public bidding, and an effective bidding process that safeguards and protects motorists from irresponsible and incompetent towers, we find that the Legislature intended that bidding for towing contracts be awarded to the lowest responsible bidder.

## VIII

The Authority and dissent assert that public bidding is not required for Parkway towing contracts because of the explicit exclusion of towing contracts set forth in the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 to –49. That the Legislature explicitly exempted towing contracts from public bidding in the local contracts law statute does not mean that the Legislature intended to exempt towing contracts from section 5.2. In view of the plain language of section 5.2 and the different statutory language of *N.J.S.A.* 40A:11–5(1)(u), we find no legal support for that position. Indeed, one could reasonably conclude otherwise; had the Legislature intended to exempt towing contracts from public bidding in section 5.2, it would have explicitly done so, as it did in *N.J.S.A.* 40A:11–5(1)(u).

If the Legislature determines that section 5.2 should provide the exemption set forth in *N.J.S.A.* 40A:11–5(1)(u) or contain bidding conditions similar to those in *N.J.S.A.* 5:10–21.1 (bids for the New Jersey Sports and Exposition Authority "shall be awarded to that responsible bidder whose bid … is most advantageous to the Authority … upon consideration of price and other factors") it can so provide. However, the Legislature has in section 5.2 chosen specifically to exempt certain contracts from public bidding and has refrained from providing an explicit statutory exemption for towing contracts.

## IX

New Jersey has a long-standing policy of requiring competitive bidding for public contracts. The Authority is required, pursuant to section 5.2, to publicly bid contracts for towing and storage services. That section explicitly requires public bidding for all contracts and does not exempt towing contracts. Section 5.2's exceptions for professional services and public convenience do not apply to preclude that requirement. Although the Authority's present selection process is better than its past procedures, control of the bidding process remains in the hands of the Authority and is, of course, subject to change by the Authority. For example, the Authority still refuses to disclose the weighted value it will give to each criterion. The new system, like the old, does not satisfy the strong public policy that underlies the public bidding requirements of section 5.2.

 Because of the disruption that would be caused if all current towing contracts were immediately declared void, the public bidding requirements will only be applied to all new towing contracts as they terminate or that have been stayed pursuant to the Court's Order of October 1, 1966. See footnote 1, *supra*, at 230, 686 *A*.2d at 331. Sevell and other tower contractors who have had contracts in the past are to be considered with the new applicants. Neither they nor other former towers are to be discriminated against nor are they to be favored. The playing field is to be level.

The judgment of the Appellate Division is reversed.

STEIN, J., dissenting.

In a class with motherhood and apple pie, the mandate that governmental contracts be subject to public bidding is almost sacrosanct. Its purpose is "to secure competition and to guard against favoritism, improvidence, extravagance and corruption." *Hillside Township v. Sternin*, 25 *N.J.* 317, 322, 136 *A*.2d 265 (1957). Statutes mandating public bidding should be "construed

with sole reference to the public good ... [and] should be rigidly adhered to by the courts." *Ibid.* But on occasion, insistence on competitive public bidding can be impractical, formalistic, and inconsistent with the public interest.

Motorists on the Garden State Parkway whose disabled cars require removal by a tow truck—and there were over 50,000 such motorists in 1993—will now have abundant reason to be apprehensive about the reliability of the tow-truck operator who is dispatched to retrieve their vehicle. The Court today orders the New Jersey Highway Authority (Authority) to select towers in the future not on the basis of competence and reliability, as the Authority proposes, but rather on the basis of which tower offers the lowest rates. Because the Authority has regulated towing rates since 1975, and will still be authorized to set maximum rates, the likelihood that the Court's mandate for competitive bidding on towing rates will achieve significant savings is minimal indeed. Moreover, because the Authority is understandably concerned about the safety of motorists whose cars break down late at night or in severe weather conditions, the Authority pragmatically concluded that to select towers in an open, competitive process based on objective criteria intended to measure competence and reliability would better serve the public interest than would selection based only on towing rates.

The Court's decision may be defensible under a literal reading of the Authority's bidding statute. But the Court displays an unwieldy, inflexible preference for competitive bidding on price when application of standard statutory interpretation principles would permit a result far more protective of the motoring public. I suspect that the Authority will promptly solicit legislative intervention to permit the selection of towers by a competitive process that focuses on competence rather than price.

I

As the majority opinion demonstrates, the facts pertinent to our disposition of this appeal have changed radically since suit was

initiated. Prior to 1990, the Authority did not advertise for bids or publicly solicit applications for towing contracts. Towing companies that previously had been awarded contracts for towing services could anticipate renewal of their contracts unless complaints concerning the quality of their service induced the Authority to seek a replacement. Charges for towing services have been regulated by the Authority since 1975. The facts stipulated before the Law Division indicate that companies providing Authority towing services prior to 1990 paid the Authority a percentage of their revenues.

Beginning in 1990, the Authority instituted an informal rating system pursuant to which interested towing companies were numerically ranked by an Authority employee on the basis of criteria that included experience, safety, availability and quality of equipment and facilities, and proximity to the Parkway, although not all of those criteria were considered in evaluating each applicant. The Authority employee recommended that the contract be awarded to the tower with the highest point score, but her supervisor could make adjustments in the evaluations and the Authority's Executive Director approved all contracts.

The current system instituted in 1994 constitutes a substantial improvement over past practices. Requests for towing proposals are now solicited by the Authority by advertisements in designated newspapers. A six-member committee evaluates each proposal based on weighted criteria, assigning each applicant a rating on a scale of one to five on each factor and multiplying the rating by that factor's weighted value to calculate an aggregate score. The criteria include reliability, experience, equipment and personnel, response time, location of facilities, and security of towed and stored vehicles. The committee recommends the award of a contract to the tower with the highest score. Since the establishment of this evaluation process, the Authority has awarded five towing contracts and each was awarded to the highest scoring qualified contractor.

The Authority's current system of awarding towing contracts to the towing company ranked highest on the basis of qualitative criteria responsibly and directly addresses the public's need for safe and reliable towing service. Counsel for the Authority represents that more than 50,000 motorists required emergency services in 1993. As the Appellate Division observed:

> The motorist whose car breaks down on the Garden State Parkway is vulnerable, especially in the late evening or early morning hours. The Parkway is a limited access highway and the motorist is cut off from help except for the assistance provided by the Authority. The motorist is required to depend on the services of a contractor imposed on him or her by the Authority. In those circumstances the opportunity for overreaching and exploitation by the contractor is substantial. Moreover, there is a legitimate concern for the personal security of the stranded motorist. This is a particularly important factor in the selection process because the contractor not only removes the vehicle from the Parkway, either to the nearest exit or to the contractor's garage, but may transport the motorist as well. Under those circumstances, character and integrity are critical elements in the Authority's selection of a towing contractor.
>
> [282 *N.J.Super.* 460, 468, 660 *A.*2d 564 (1995).]

The Authority's current Request for Proposal form eliminates any variable concerning compensation to the Authority. The form stipulates that each towing company awarded a contract will pay to the Authority the following percentages of its gross receipts:

| | |
|---|---|
| 0 to $12,000 | 3% |
| $12,001 to $16,000 | 4% |
| Over $16,000 | 5% |

Similarly, all prospective towers must agree to "adhere to Parkway regulated rates for services provided." The applicable regulation, *N.J.A.C.* 19:8–2.12, prescribes flat rates for towing charges based on the towed vehicle's gross weight, and also mandates that charges for parts and labor in connection with repair services conform to those set forth in Chilton's Labor Guide and Parts Manual. The Court's decision mandates that those regulated towing charges must be subjected to competitive bidding, at rates not to exceed the regulated rate.

## II

A fundamental tenet of statutory construction is that "every effort should be made to harmonize the law relating to the same

subject matter. Statutes *in pari materia* are to be construed together when helpful in resolving doubts or uncertainties and the ascertainment of legislative intent." *State v. Green,* 62 *N.J.* 547, 554–55, 303 *A.*2d 312 (1973). We have often observed that "statutes [that] deal with the same matter or subject ... and which seek to achieve the same overall legislative purpose ... should and must be read *in pari materia." Mimkon v. Ford,* 66 *N.J.* 426, 433, 332 *A.*2d 199 (1975). Although that principle applies most forcefully when the statutes were enacted at the same time, "it may appropriately be applied even when the statutes were adopted at different times and make no reference to each other." *Id.* at 434, 332 *A.*2d 199.

The Court acknowledges that the Legislature specifically has exempted municipal and county towing contracts from the competitive bidding requirements of the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 to –49, imposing as requirements for such exemption that the contracts be awarded on non-exclusionary and non-discriminatory terms and conditions and that the rates to be charged are regulated. *N.J.S.A.* 40A:11–5(1)(u). The Court concludes that the Legislature did not intend that the exemption permitting local governments to award towing contracts without competitive bidding on towing rates should also apply to the Authority. *Ante* at 244–245, 686 *A.*2d at 339.

The legislative history pertinent to the statutory exemption of municipal and county towing contracts from the Local Public Contracts Law bidding requirements, enacted as *L.* 1991, *c.* 142, demonstrates that the legislative rationale for the exemption applies with equal, if not greater, force to the Authority. The source Assembly Bill, A–3011, was introduced in response to a 1989 Opinion of the Attorney General concluding that municipalities that failed to publicly bid contracts for towing services acted in violation of the Local Public Contracts Law. *Application of Local Public Contracts Law to Municipal Towing Services,* Op. N.J. Att'y Gen. No. 180 (Sept. 5, 1989). That opinion concluded that municipalities were required to solicit competitive bids and to

award towing contracts to the lowest responsible bidder based on the rates charged for towing services. *Ibid.* The Attorney General observed that to avoid favoritism and corruption specifications should be "designed to promote the broadest possible competition," and cautioned municipalities to "avoid the use of unnecessarily exclusionary specifications and bidder requirements." *Ibid.*

The exemption legislation, introduced to limit the effect of the Attorney General's opinion, was intended to allow municipalities and counties additional flexibility in the award of towing contracts.

> The amendments I propose would permit municipalities and counties which have found the bidding process inadequate in their attempt to fulfill their statutory obligations with respect to towing services to utilize a reasonable non-exclusionary and non-discriminatory process which may include the use of a rotating list as an option. I am confident that this option will ensure that the underlying goals of the Local Public Contracts Law are met and will ensure competition in the marketplace.
>
> [*Governor's Reconsideration and Recommendation Statement to Assembly No. 3011, reprinted following N.J.S.A.* 40A:11–5.]

An internal memorandum to the Governor's Counsel for Legislation and Policy disclosed, for example, that local governments that selected towers based only on competitive bids "are at a severe disadvantage during times of inclement weather or major accidents in obtaining towing services from other vendors." Memorandum from Assistant Counsel Christopher Palodino to Counsel for Legislation and Policy Gregory Lawler (Apr. 22, 1991). Subsequent to the Legislature's concurrence with the terms of the Governor's Conditional Veto of A–3011, Governor's Counsel recommended approval of the legislation, noting that towing contracts implicated factors such as equipment, experience, response time, and location of facilities that were not necessarily addressed by the constraints of the bidding process, and observing that the proposed legislation permitted local governments to choose between competitive bidding and the award of contracts on a non-discriminatory and non-exclusive basis at regulated rates. Memorandum from Assistant Counsel Christopher Palodino to Special Assistant Diane Russell (May 9, 1991); Memorandum from Coun-

sel for Legislation and Policy Gregory Lawler to Governor Jim Florio (May 23, 1991).

The Legislature's willingness to exempt municipal and county towing contracts from mandatory competitive public bidding strongly suggests that a parallel exemption for the Authority's towing contracts would be consistent with the Legislature's objective. The danger of favoritism and corruption in the award of towing contracts by local governments, although of paramount public concern, is diminished by the legislative requirement that such contracts be awarded on a non-exclusive and non-discriminatory basis and at regulated rates. Moreover, municipal and county towing contracts do not implicate the serious safety concerns that affect the award of towing contracts by the Authority. A motorist whose vehicle is disabled in a municipality has the option of requesting assistance from a service station or tower known to the motorist, and reliance on the municipality's designated tower is simply an available alternative. On the Garden State Parkway, motorists whose cars are disabled have only one option, and that is to seek assistance from the Authority's designated tower. That the Legislature permitted municipalities to bypass competitive bidding for towing services virtually compels the conclusion that the Legislature would have intended to make available a similar exemption for the Authority. The legislative history conclusively demonstrates that the exemption statute was limited to local governments because the 1989 Attorney General's opinion dealt only with local governments.

We often have observed that "statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.' " *Schierstead v. City of Brigantine*, 29 *N.J.* 220, 230, 148 *A.*2d 591 (1959) (quoting *Morris Canal & Banking Co. v. Central R.R.*, 16 *N.J. Eq.* 419, 428 (Ch.1863)). "Our task is to have the law make sense[.]" *In re Executive Comm'n on Ethical Standards*, 116 *N.J.* 216, 221, 561 *A.*2d 542 (1989). "We will enforce the legislative will even

when the language of the statute is in conflict therewith." *Id.* at 227, 561 *A.*2d 542.

We applied that sound principle of statutory construction in *Fidelity Union Trust Co. v. New Jersey Highway Authority*, 85 *N.J.* 277, 426 *A.*2d 488, *appeal dismissed for want of substantial federal question*, 454 *U.S.* 804, 102 *S.Ct.* 76, 70 *L.Ed.*2d 73 (1981), involving a challenge by Authority bond issue trustees to the validity of an amendment to the Authority's enabling legislation that allowed the Governor and either the State Treasurer or Comptroller to veto all Authority toll increases or decreases. The Trustees contended that the amendment was inconsistent with the bond indenture that incorporated the provisions of the Authority's enabling legislation, specifically *N.J.S.A.* 27:12B–14, pursuant to which tolls "shall not be subject to supervision or regulation by any other commission, board, bureau or agency of the State." *Id.* at 292, 426 *A.*2d 488. We rejected the trustees' contention that that section was violated by authorizing the Governor and another official to veto a modification of the tolls:

Literally read, this might be so. However, that provision must be interpreted *in pari materia* with provisions authorizing a transfer of the Authority's functions to others and granting the Governor authority to nominate the Authority's members and to designate the chairman and vice-chairman. Therefore the language should not be given that broad interpretation derived from a literal reading.

[*Ibid.*]

### III

Advocates of good government are likely to applaud the Court's conclusion that the Authority must engage in competitive public bidding on rates before awarding towing contracts. Only on close scrutiny does it become evident that the Court's holding is likely to do more harm than good.

The record before us demonstrates that the Authority's pre–1990 system for selecting towers has been abandoned and replaced by a system of public solicitation of towing service proposals and a comprehensive ranking system for evaluating the competence and responsibility of towers responding to such solicitations. The Authority has removed towing and repair charges as a criterion

for selecting towers, having established by regulation, *N.J.A.C.* 19:8–2.12, the precise fees to be charged for Parkway towing services based on the registered gross weight of the towed vehicle. In addition, repair charges for parts and labor are required to conform to those prescribed by the current edition of Chilton's Labor Guide and Parts Manual. The Authority's discretionary decision to exclude towing and repair rates from the criteria to be used in selecting towers obviously reflects the Authority's informed judgment that minor variations in rates are less significant than responsibility, experience and competence in selecting towing companies to serve Parkway motorists.

The Court overrides the Authority's informed judgment and requires that the Authority award towing contracts only to those towers who bid the lowest rates. The Court implies that the Authority can address reliability by pre-qualification of bidders but, as the Attorney General's 1989 opinion explains, overwriting bid specifications to exclude potential bidders is merely another form of prohibited favoritism. In fact, the Court has forced the Authority to select towers based on price rather than competence, a result that can hardly be understood to advance the best interests of Parkway motorists.

In my view, the Authority's bidding statute should be interpreted pragmatically, and harmoniously with the Local Public Contracts Law, to confer on the Authority the same exemption now available to all municipalities and counties. That exemption would permit the Authority to avoid competitive public bidding of towing rates if the Authority continued to select towers based on competence in accordance with its current system. That interpretation of the Authority's bidding statute would better reflect the likely intent of the Legislature and would better serve the public interest than does the Court's mandate that the Authority select towers on the basis of rates rather than reliability.

*For reversal*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and COLEMAN—6.

*For affirmance*—Justice STEIN—1.