Wachtler, J.
Since 1966 the County of Onondaga has had a fire control center manned by 10 fire dispatchers. The center was in operation 24 hours a day. Late in 1971, the Fire Coordinator sent out letters to various manufacturers and fire alarm reporting systems inquiring if they were interested in providing a county-wide fire alarm reporting system for the appellant. Both Interstate and respondent expressed an interest in doing so.
Interstate offered to supply the county with a central control console worth $35,000 without charge on the condition that Interstate be allowed to charge up to a $675 override cost on each transmitter sold to a noncounty purchaser and that the county assist in promoting these sales. No transaction was to be final until the cost of the console was recouped by Interstate through its override charges. At that point, title to the console would be given to the county. The console was similar to a radio receiving unit, with the reporting alarm boxes the transmitters. It was expected that the transmitters would be used, inter alia, by restaurants, nursing homes, hospitals, shopping centers, any concern with fire detection systems in operations, and in any other high value or high risk commercial concern within the fire district.
The Interstate proposal was unanimously accepted by the Committee of Public Safety of the County Legislature, and a proposal for its adoption was submitted to the County Legislature.
Respondent opposed the ‘ ‘ acceptance ” of Interstate’s offer by the county on the grounds that it violated section 103 (subd. 1) of the General Municipal Law which prohibited the letting of contracts involving an expenditure of $1,000 on purchase contracts and $2,500 on contracts for public work without soliciting sealed bids to determine the lowest bidder. There is no contention that the lack of competitive bidding was due to the existence of a public emergency. (General Municipal Law, § 103, subd. 4.)
*413 Appellant first claims that competitive bids were not necessary because there was no contract involved in this case. This is predicated on the contention that only the County Executive can execute a contract, and he had not done so. Appellant claims the arrangement constituted a conditional gift
We do not believe this agreement can be considered a gift (i.e., something given to the county 6 ‘ without consideration” McKenzie v. Harrison, 120 N. Y. 260, 265). There was in fact a distinct mutual consideration. The county wanted a countywide fire protection system, in return for which it was willing to help Interstate make a profit by helping it sell transmitters. Such a quid pro quo sounds in contract. Since the county viewed the arrangement as a gift, it obviously felt there was no need to enter into a contract. The failure to treat the arrangement as a contractual one should not bar a court from dealing with the initial alleged illegality, that is the noncompetitive award to Interstate.
Appellant also asserts that there was no need for competitive bidding because there was nothing to stop potential purchasers of the transmitters from buying their call box from a competing firm. The alleged competition that appellant claims exists is theoretical at best. The Fire Coordinator of the county sent out numerous letters seeking assistance and advertising for Interstate. The letters indicated that Interstate was, in fact, the only practical choice to make and a potential purchaser of a transmitter for a county-wide protection system would more than likely select the company recommended by the county even if the purchaser was aware of the possibility of buying from competitors. There was even an official news release mentioning, among other things, that the Public Safety Committee had unanimously accepted Interstate’s offer. In fact part of that agreement between the county and Interstate stated that the county “ will cooperate fully with Interstate Traffic in its market and survey effort ”,
Since this is clearly not a gift, and the county has clearly entered into an agreement with Interstate, it is now necessary to address ourselves to the language and intent of section 103 (subd. 1) of the General Municipal Law which stated in part: “ 1. Except as otherwise expressly provided by an act of the legislature or by a local law adopted prior to September first, *414 nineteen hundred fifty-three, all contracts for public work involving an expenditure of more than twenty-five hundred dollars and all purhcase contracts involving an expenditure of more than one thousand dollars, shall be awarded by the appropriate officer, board or agency of a political subdivision or of any district therein including but not limited to a soil conservation district, to the lowest responsible bidder furnishing the required security after advertisement for sealed bids in the manner provided by this section * * * In cases where two or more responsible bidders furnishing the required security submit identical bids as to price, such officer, board or agency may award the contract to any of such bidders. Such officer, board or agency may, in his or its discretion, reject all bids and readvertise for new bids in the manner provided by this section.” One commentator has stated that: “The provisions of statutes, charters and ordinances requiring competitive bidding in the letting of municipal contracts are for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable, and they are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest.” (10 McQuillin, Municipal Corporations, § 29.29.) A review of the terms of the agreement in this case will show that it falls within the specific wording of section 103 and within the spirit of that section as analyzed by McQuillin, supra.
Most basically, the agreement falls within section 103 because there are expenditures greater than $1,000 to be made by the county. Fire departments will have to pay interface charges on master boxes. And even without the override charge, the county will have to pay from $1,525 to $1,825 for eael p its transmitters. There would also be a nominal charge for trai ,ng a new service contractor, amount unspecified. It is certainly possible that a rival company might have charged less for the transmitters, the overrides on the master boxes, and the training costs.
The facility and the manpower to house the console already existed, but a competitive bidder might have assumed the entire cost of manning the operation.
*415 In addition, a competitor might have charged less for the transmitter, override cost, and service cost to the noncounty purchasers of such equipment. The cost of an item to the citizens of the county should be considered even when the citizens pay the costs directly themselves. (East Bay Garbage Co. v. Washington Twp. Sanitation Co., 52 Cal. 2d 708.) Surely a county has an obligation to see that its citizens get the best buy possible particularly where the county has agreed with the seller to do all it can to help market and survey the area for the seller. (See Yohe v. City of Lower Borell, 418 Pa. 23.)
It is also possible that a competitive company would agree to provide the county with better equipment on the same terms as Interstate was willing to give. Section 100-a of the General Municipal Law talks in terms of getting the “ maximum quality at the lowest possible cost ” (emphasis added).
A competitor might also have given the county better agreement terms than Interstate. For instance, a competitor may have given the county title to the console without making the transfer of title contingent on the completion of a certain number of transmitter sales. If a competitor would have turned the title to the console over to the county earlier, it would have been of benefit to the public interest.
The agreement made between the county and Interstate also opens the door to fraud, corruption, and favoritism, albeit there is no sign of such a situation in the case at bar. One of the purposes of the competitive bidding statutes is to eliminate the opportunity for fraud, favoritism or corruption by office holders. (Marangi Bros. v. Board of Comrs., 33 N. J. Super. 294, 303; cf. Price v. Philadelphia Parking Auth., 422 Pa. 317, 332; cf. Weber v. City of Philadelphia, 437 Pa. 179, 183-184.) And no matter how one views this agreement, it is still a public contract given to a private contractor without competitive bidding. (Accord McKim v. Village of South Orange, 133 N. J. L. 470, 473-474.) A wayward public official could use the secrecy and ambiguity inherent in any agreement not requiring public advertising and bidding to do great mischief. The citizens purchasing the service or equipment receive what is usually not the “ greatest possible value for the least expenditure ” (East Bay Garbage Co. v. Washington Twp. Sanitation Co., 52 Cal. 2d 708, 713, supra) and the citizenry as a whole suffers from pro *416 viding the opportunity for dishonest or unthinking officials to betray their public trust.
To exempt this type of agreement from the competitive bidding requirements of section 103 of the General Municipal Law would allow public officials to do indirectly what they cannot do directly. .Such an exemption would make it quite simple for most sellers and public officials, who- wish to avoid the statute’s requirement, to adopt an “ arrangement ” whereby the governmental unit would pay no money but would be used as a rental or percentage conduit through which a seller could make large profits without having to subject his wares and price to the .salutary effect of'competitive bidding.
The only authority in New York that appears to run contrary to the position taken by us today is the case of Matter of Hauger v. Earl (275 App. Div. 437). In that case the court held that where a city acquired parking meters by allocating a portion of meter revenues to the seller, there was no expenditure by the city, and, therefore, no need for competitive bidding. In Hauger, the private company took a percentage of the revenue from the meters until the meters were paid for. It is certainly possible that a competitive company would have taken a lower percentage of the meter intake or would have taken a lower absolute sum in which case, the city would have made a greater profit from the meters at an earlier date. A contract which provides for a lesser income to the governmental unit than a competing contract might provide, is an ‘ ‘ expenditure ’ ’ within the meaning of section 103. Therefore, to the extent that Hauger suggests a view different from that expressed above, it is inapplicable.
It is very possible in the case at bar that the agreement between Interstate and the county was the best agreement possible. But absent competitive bidding we have no way of knowing that. We can see no major burden added to a governmental unit in requiring bidding in a case such as this, and we can foresee much harm that could result from a lack of. competitive bidding. Most importantly, the policy interest behind section 103 of the General Municipal Law virtually mandates that there be competitive bidding when the county is so deeply involved in an agreement and is, in fact, a recipient of the seller’s products and services. Accordingly the order of the Appellate Division should be affirmed.
*417 Chief Judge Fuld and Judges Burke, Breitel, Jasen and Jones concur; Judge G-abrielli taking no part.
Order affirmed, without costs.