Chief Judge Kaye
(dissenting). We conclude, as did the Appellate Division, that based on a review of the total character of the arrangement presented, the utility interference work here was “public work” within General Municipal Law § 103 *267 (1). Given that determination, which is dispositive, we do not. reach the second, bypass authority issue.
Resolution of the law question properly begins with the facts at issue. Beneath the streets of New York City lie miles and miles of gas pipelines, water, steam and sewage conduits, electrical wiring, and telephone and television cables. When the City undertakes a street reconstruction project, these subsurface facilities — crucial components of a system that delivers vital utility services — often stand in the path of the City’s proposed work, and measures must be taken to protect or relocate them. Without such utility work, street reconstructions cannot proceed. By the same token, but for the City street construction, the incidental utility work would not be necessary.
In general, utility companies have a legal duty to ensure the continuation of their services by arranging and paying for this type of work, referred to as “utility interference work” because it prevents construction efforts from interfering with utility lifelines located under affected streets. Prior to 1992, street reconstruction contracts let out for bid by the City did not include provision for the performance of utility interference work. Rather, following the City’s award of a contract for the street reconstruction work, notices would be issued to the utility companies, informing them that their subsurface facilities needed to be protected or relocated in order for the City’s project to go forward.
As described in City affidavits, and undisputed by petitioner, the utility companies found it impractical and prohibitively expensive to hire separate crews for this work. Instead, they separately negotiated agreements for the utility work with the contractor awarded the City’s street reconstruction contract. The result, however, was that the City’s work was often substantially delayed. Piecemeal contract negotiations between the City work contractor and the utilities slowed the progress of projects, as did disputes among the parties during the work. These conflicts often centered on the extent, impact and value of the utility interference work, as well as the actual time required to clear the interferences. Because these considerations had not been included in the City’s contract, contractors often requested, and were granted, extensions of time due to the “extra work.” As a result, on some major reconstruction projects the City was compelled to extend completion dates in order to accommodate the utility interference work, adding cost and public inconvenience.
*268 This system, additionally, at times imposed excessive costs upon the utility companies, which they then passed on to their customers. Aware that they represented the utility companies’ most practical means of accomplishing the required utility work, the City work contractors held a superior bargaining position, presenting an opportunity for gouging the companies for the necessary utility work. The utility companies, with no viable alternative, were compelled to pay.
In 1992, the City took action in its own interest. Seeking to eliminate unnecessary delays, uncertainties and costs surrounding street reconstruction projects, the City entered into a “Joint Bidding Agreement” (the Agreement) with Consolidated Edison, New York Telephone and Empire City Subway. The Agreement provides that, for certain City construction projects (mutually agreed upon between the City and the utility companies which are parties to the Agreement), the necessary utility interference work is to be included in the public contracts when they are let out for bid. The City is then required to award the contracts to the lowest responsible bidder for the entire project — including both the construction work and the utility interference work. Under the terms of the Agreement, the City must pay the successful contractors for the entire project, including the necessary utility interference work, and in turn the utility companies must compensate the City for the bid amounts attributable to the utility interference work, plus a contract administration charge of 5%.
Pursuant to the Agreement, in 1996 the City invited bids on three street reconstruction contracts. The specifications notified bidders that utility interference work had been included in the contracts and that the bids would be compared on the basis of total price. Although petitioner was the low bidder on the construction portions of each project, it had the highest total bid for all three contracts. This irregular outcome was attributable to petitioner’s high bids on the utility work required under each contract. Indeed, petitioner’s bid for the utility work for one of the projects — the Brookline Boulevard contract — was more than 15 times higher than the other nine bids submitted for the project.
Under the Agreement, the lowest total bidder for each of the three projects was to be compensated for its work by the City. In turn, the utility companies agreed to reimburse the City for the cost of the utility interference work, as well as the difference between the actual street reconstruction work cost and the lowest bid received for that work. The terms of the ar *269 rangement were memorialized in commitment letters executed by the utility companies.
The legal issue presented here is whether the three contracts providing for both the street reconstruction work and the incidental utility interference work were properly awarded in accordance with the competitive bidding requirements of General Municipal Law § 103 (1). We conclude that they were.
Competitive bidding on public contracts has long formed a part of New York law, having originated in local charters and ordinances as far back as the 1850’s (see, e.g., Brady v Mayor of City of N. Y., 20 NY 312; People ex rel. Smith v Flagg, 17 NY 584). In 1953 the Legislature enacted General Municipal Law § 103 to codify the diverse legislation that was then on the books regarding competitive bidding, and declared:
“this article shall be construed in the negotiation of contracts for public works and public purchases to which political subdivisions or [any] district therein is a party so as to assure the prudent and economical use of public moneys for the benefit of all the inhabitants of the state and to facilitate the acquisition of facilities and commodities of maximum quality at the lowest possible cost” (General Municipal Law § 100-a).
To that end, section 103 (1) of the General Municipal Law provides that all contracts for “public work” involving an expenditure of more than $20,000 shall be awarded to the lowest responsible bidder. The majority concludes that the contracts under review here cannot be awarded pursuant to the competitive bidding requirements of General Municipal Law § 103 (1) because the utility interference work included in those contracts does not constitute “public work.” We disagree.
Neither the General Municipal Law nor its legislative history defines the term “public work.” This Court has, however, previously determined when an agreement involving both municipal and private work should be considered a contract for a “public work” under the competitive bidding statute. Our test for determining a “public work” in that context should control here.
As we held in Matter of Exley v Village of Endicott (51 NY2d 426, 432), where a contract has some attributes that could be subject to public bidding requirements and some that would traditionally be exempt from the competitive bidding statute, it is “the total character of the arrangement which controls.” At *270 issue in Exley was whether a municipality had violated General Municipal Law § 103 (1) by failing to offer New York Telephone’s competitors the opportunity to bid for the right to provide a phone system. Although the arrangement between New York Telephone and the municipality was seemingly in the form of a lease, the contract also had elements of a sale “purchase contract” subject to competitive bidding requirements. To determine whether this “hybrid” agreement fell within the scope of General Municipal Law § 103 (1), the Court reviewed its terms and conditions and ascertained that its “total character” was “in the nature of a true lease” and therefore “not within the ambit of the competitive bidding statute” (id., at 433).
That same test was applied in Matter of Citiwide News v New York City Tr. Auth. (62 NY2d 464), where this Court again had to determine whether an agreement providing for the performance of both private work (a license to install, operate and maintain newsstands) and public work (the construction of newsstands) was subject to the competitive bidding statute. Finding that the focus and purpose of the agreement was “to provide for the maintenance and operation of newsstands in the subway system,” the Court concluded that the “total character of the arrangement” was that of a private license agreement exempt from section 103 (l)’s requirements (id., at 471-472, 473). The fact that, in addition to payment of license compensation fees in excess of $60 million, proper performance of the agreement required $2 million worth of work rehabilitating City-owned facilities and constructing newsstands on City property, did not transform its essential character from that of a license agreement into a “public work” (id., at 473). The Court most recently applied that same test in Matter of AT/Comm, Inc. v Tufo (86 NY2d 1) to determine whether a contract for the installation of an electronic toll-collection service should have been subject to the public bidding requirements of Public Authorities Law § 359.
Here the total character of the arrangement is of a “public work” nature. The single, overriding goal of the contracts at issue is to reconstruct the City’s streets. The incidental utility interference work — less than 10% of the cost of the street reconstruction projects — is a necessary component of that work and does not alter the public purpose of the projects. The utility interference work is not an end unto itself, but merely a necessary means to achieve the public purpose. Indeed, the utility interference work has no independent usefulness to the City or the utility companies.
*271 Nor does the fact that the law requires the utility companies, and not the City, to pay for the interference work determine the nature of that work. Although the majority, citing Citiwide (supra) and Matter of Signacon Controls v Mulroy (32 NY2d 410), stresses that a key factor in determining what constitutes a contract for “public work” is whether it is funded out of the public coifers, the “expenditure of public funds, direct or indirect, * * * is not sufficient by itself to trigger the requirements of [the competitive bidding statute]” (Matter of Citiwide News v New York City Tr. Auth., 62 NY2d at 471, supra; see also, Matter of Signacon Controls v Mulroy, 32 NY2d at 416, supra; 19 Opns St Comp, 1963 No. 63-226, at 164 [construction of village water system on property owned or leased by village is subject to competitive bidding even though the cost of such facilities will be paid either by reimbursement or directly by a private utility company]). Indeed, as we recognized in Signacon itself, the fact that a large portion of the costs of a municipal fire control system were to be paid by parties other than the municipality did not remove the contract for that system from the realm of section 103 (l)’s bidding requirements (32 NY2d at 415, supra). Regardless of ultimate responsibility for funding, the utility interference work at issue here is undeniably an integral, necessary — though incidental — component of the City street reconstruction project, and therefore may qualify as a “public work” subject to the competitive bidding statutes.*
*272 We see no material distinction between this case and the prior “hybrid” contract cases in which this Court has consistently looked to the total character of the arrangement in order to determine the relevance of section 103 (1). Were the Court’s clear, consistent test applied, the Appellate Division order would be affirmed. The majority’s contrary conclusion is, quite frankly, not only difficult to comprehend on the facts presented but also leaves uncertain for the future just when our “total character of the arrangement” test remains relevant.
In the end, the majority’s conclusion rests entirely on dire predictions which are wholly without basis.
First, on the law, it is a curious argument that subjecting these City street reconstruction projects to competitive bidding as public works under General Municipal Law § 103 (1) — as we would do — multiplies the opportunities for corruption, fraud and favoritism. The opposite is true. As is plain from the majority’s own references, the underlying purpose of such bidding is to safeguard the public interest (see, e.g., majority opn, at 256); the public bidding requirements are more, not less, onerous to assure that objective (see, e.g., majority opn, at 257-258).
The majority’s reliance on this Court’s fraud discussion in Signacon (32 NY2d 410, supra) is illustrative (majority opn, at 260-261). There, the municipality sought to circumvent compliance with General Municipal Law § 103 (1) by characterizing an agreement as a “gift” and awarding it to a private contractor without competitive bidding. The Court, however, concluded that the arrangement opened the door to fraud, corruption and favoritism. Noting that “[o]ne of the purposes of the competitive bidding statutes is to eliminate the opportunity for fraud, favoritism or corruption by office holders,” the Court concluded that, because the contract had been awarded without competitive bidding, a “wayward public official could use the secrecy and ambiguity inherent in any agreement not requiring public advertising and bidding to do great mischief’ (id., at 415). It was the municipality’s failure to submit the contract to the public bidding process that provided “the opportunity for dishonest or unthinking officials to betray their public trust” (id., at 415-416).
Second, beyond the ample case law establishing the salutary effects of public bidding, on the facts before us there is no sign *273 of any evil at work in this case, nor does the Court identify any. To the contrary, the City and the utility companies in the circumstances presented have a single, common interest, which is that the work — incidental to City street reconstruction and serving no independent private purpose — be accomplished most economically and most efficiently.
The majority, moreover, makes much of the purported inadequacies of the commitments executed by the utility companies, characterizing them as risky security blankets (majority opn, at 261-262). By signing the commitment letters, the utility companies contractually bound themselves to the terms set forth thereunder, including the obligation to pay “the difference between the overall low bidder’s price for the City’s share of the work and the lowest price received on the City’s share of the work.” The majority’s perceived risks, again, are unfounded. The utility companies have powerful incentives to assure the success of these arrangements, among them their continuing relations with the City (as owners of the underground pipelines, conduits, wiring and cables) and their desire to avoid reverting to the prior situation. The joint arrangements are advantageous to them as well as to the City.
Finally, there is no foundation for the prediction that these arrangements will have sweeping consequences, and will become the “template for all future multimillion dollar dealings” (majority opn, at 260). The test that defines the matter before us as a “public work” was sufficient in Exley, Citiwide and ATI Comm — and remains sufficient — to identify arrangements that were in fact private. There can be no doubt that the inclusion of utility interference work in the publicly bid reconstruction contracts here is consistent with the public interest and assures “the prudent and economical use of public moneys for the benefit of all the inhabitants of the state” (General Municipal Law § 100-a; see also, Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d 144, 148 [public bidding statutes, which were “not enacted to help enrich * * * corporate bidders but, rather, were intended for the benefit of* * * taxpayers,” should be “construed and administered ‘with sole reference to the public interest.’ ”]).
By including all necessary work in one contract, the City ensured the timely and efficient completion of the public works projects at the lowest net construction cost available through competitive bidding. The fact that the utility companies also stand to benefit from the inclusion of utility work in these contracts does nothing to diminish the benefits received by *274 City taxpayers. Indeed, allowing contractors to charge utility companies exorbitant rates for interference work necessitated by a public works project disserves the public interest and likely hurts the pocketbooks of millions of City residents who are also ratepayers. We would affirm the Appellate Division order.
Judges Titone, Smith, Levine and Ciparick concur with Judge Bellacosa; Chief Judge Kaye dissents and votes to affirm in a separate opinion in which Judge Wesley concurs.
Order reversed, etc.

 Nor does the Gas Facility Cost Allocation Act (the GFCAA) (L 1988, ch 357) signal that only the Legislature can authorize the City to make utility interference work part of a “public work” contract (majority opn, at 259-260). Significantly, the GFCAA authorized the City to enter into complex agreements with gas utilities for the purpose of sharing the costs of gas line interference work necessary to perform City water and sewer projects. The legislative history reveals that the GFCAÁ was the end product of long-running negotiations between the City and Brooklyn Union Gas over who should bear the cost of such gas line interference work. The GFCAA .replaced the common-law rule requiring gas utilities to pay for the costs of the interference work and allowed an agreement between the City and Brooklyn Union Gas — establishing “a roughly 50%-50% division of costs” between them — to go forward (Bill Jacket, L 1988, ch 357, Mem of Legislative Representative James Brenner, Office of Mayor of City of NY, reprinted in 1988 McKinney’s Session Laws of NY, at 2030; Letter of Assemblyman G. Oliver Koppell; Mem of New York State Department of Public Service).
The agreements at issue in this case do not contemplate a cost-sharing scheme, nor do they shift the financial responsibility for the utility interference work, which, by law, must be borne by the utility companies. Indeed, the utility companies not only remain responsible for the cost of the interfer *272 ence work but must also compensate the City for the difference between the actual cost of the reconstruction portion of the contract and the low bid submitted for that work.