IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 12, 2014 Session

## ROCK-TENN CONVERTING COMPANY, ET AL. V. THE CITY OF MEMPHIS, ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH121497      Walter L. Evans, Chancellor**

---

## No. W2014-00626-COA-R3-CV - Filed September 9, 2014

---

The dispute in this case arises from a contract for recycling services entered into by the City of Memphis and a recycling vendor. A competing recycling vendor and a citizen and taxpayer of the City of Memphis filed a complaint for declaratory judgment seeking to void the contract, on the ground that the contract was subject to the City of Memphis's competitive bidding procedure. The trial court determined that, because the City of Memphis did not expend any monies in connection with its recycling contract, the contract was not subject to competitive bidding. The trial court granted summary judgment to the City of Memphis and its recycling vendor and this appeal followed. Discerning no error, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which RICHARD H. DINKINS, J., and W. Michael Maloan, Sp. J., joined.

Waverly D. Crenshaw, Jr., and W. Travis Parham, Nashville, Tennessee, for the appellants, Rock-Tenn Converting Company and Talisha Haynes.

Prince C. Chambliss, Jr., Felisa N. Cox, Robert F. Miller, Richard D. Bennett, Patrick G. Walker, and Henry B. Talbot, Memphis, Tennessee, for the appellees, The City of Memphis and FCR Tennessee, L.L.C.

# OPINION

This case began on September 24, 2012 when Rock-Tenn Converting Company ("Rock-Tenn") and Talisha Haynes (together with Rock-Tenn, "Appellants") filed a complaint for declaratory judgment against the City of Memphis ("City") and FCR Tennessee, L.L.C. ("FCR," and together with the City, "Appellees"). By their complaint, Appellants asked the trial court to declare void a January 2012 amendment to the contract that is the subject of this appeal.

Rock-Tenn is a provider of recycling services. Ms. Haynes is a Memphis resident and taxpayer. The City is a home rule municipality as authorized by Article XI, section 9 of the Constitution of the State of Tennessee ("Constitution"). The City operates under a private charter within Shelby County, Tennessee. FCR is a provider of recycling services.

A municipality, such as the City, that has chosen to be governed by home rule is also prescribed a procedure for amending its charter by Article 11, section 9 of the Tennessee Constitution, which provides, in relevant part:

> Any municipality may by ordinance submit to its qualified voters in a general or special election the question: "Shall this municipality adopt home rule?"
>
> In the event of an affirmative vote by a majority of the qualified voters voting thereon, and until the repeal thereof by the same procedure, such municipality shall be a home rule municipality, and the General Assembly shall act with respect to such home rule municipality only by laws which are general in terms and effect.
>
> *                          *                          *
>
> A charter or amendment may be proposed by ordinance of any home rule municipality, by a charter commission provided for by act of the General Assembly and elected by the qualified voters of a home rule municipality voting thereon or, in the absence of such act of the General Assembly, by a charter commission of seven (7) members, chosen at large not more often than once in two (2) years, in a municipal election pursuant to petition for such election signed by qualified voters

of a home rule municipality not less in number than ten (10%) percent of those voting in the then most recent general municipal election.

Pursuant to the foregoing section of the Constitution, in January 1964, the City adopted home rule by Ordinance No. 1117. Charter Home Rule Amendment Ordinance 1852 was adopted in 1966. Ordinance 1852 grants the Mayor of the City of Memphis contracting authority for the City. Section 14 of the Home Rule Amendment provides:

> Be it further ordained, that the power to contract (other than by franchise agreements) shall remain with the Mayor; however, all contracts requiring disbursements of funds shall be limited in an amount not in excess of that provided in the appropriate budget, either operations or capital funds. In the event an expenditure of extraordinary nature and not provided for shall appear to be reasonable and in the public interest, a request may be submitted by the Mayor and thereafter approved or rejected by the Council.

Article 7, section 51(1) of the City of Memphis Charter (the "Charter") identifies the types of contracts that must be competitively bid. This section of the Charter provides, in pertinent part:

> No contract involving an expenditure exceeding ten thousand dollars ($10,000.00) shall be awarded or let to the lowest and best bidder until after the advertisement by at least three publications in a newspaper published and circulated in the City of Memphis within the calendar week before the date fixed in the advertisement upon which bids are to be received.

Section 51 of the Charter was amended by Home Rule Amendment Ordinance No. 4434 to allow the Memphis City Council to adjust the dollar amount for purchases requiring newspaper advertisement for competitive bidding, discussed in detail, *infra*.

The Memphis City Code of Ordinances ("Code of Ordinances") Section 5-4-8 is titled "Purchase of goods and supplies;" it provides, in relevant part:

**Sec. 5-4-8. Purchase of goods and supplies**

C.    1.  Notwithstanding any other provision of the Charter or this Code, no contract for equipment,

apparatus, material, supplies, goods or services for the city involving more than $50,000.00 shall be made except after the contract shall have been advertised in a newspaper of daily circulation for two consecutive days in the week preceding the day on which the bids are to be received.

2. On any contract for equipment, apparatus, materials or supplies involving more than $25,000.00, but less than $50,000.00, the bid procedure of the purchasing division of the City of Memphis shall be used.

3. Under the bid procedure, when the items sought are less than $25,000.00, the purchase may be consummated by purchase order and approval of the purchasing agent.

4. Notwithstanding any other provision of the Charter or this Code, the discretionary amount allowable and necessary for division purchases shall be $5,000.00 with approval of the division director.

5. If the items sought are in excess of $50,000.00, then the purchase must be consummated by written contract signed by the mayor.

On August 1, 1995, the City entered into a contract with FCR (the "Initial Contract"). Under the Initial Contract, FCR agreed to operate and maintain Recycling Facilities (as defined by the contract) within the City to process and dispose of Recycled Materials (as defined by the contract). The term of the Initial Contract was for ten years, but it provided for extensions of the initial term. The parties extended and amended the Initial Contract on a number of occasions, most recently on January 9, 2012. The January 9, 2012 amendments and extension provides for a contract expiration date of August 26, 2022.

The Initial Contract, at Article IV, section 4.1(a), included an agreed upon formula concerning the payments to be made to the City as the customer:

Commencing with the first day of the first Billing Period

subsequent to the Service Date, and for that and each Billing Period thereafter, the **City shall be paid a monthly Customer Fee by the Company** in accordance with this Article IV and calculated as follows:

\*                                    \*                                    \*

Monthly Customer Fee (CF) = ($50) X (RM).

(Emphasis added). The Initial Contract also provided that FCR would pay the City an Annual Revenue Share equal to: (Average Revenue - $110) X .50 X $RM_y$, where $RM_y$ = the sum of $RM_m$ for the Billing Year.

FCR and the City entered into an amended contract in 1999 ("Amendment 1"). Likewise, in 2002, the parties entered into another amended contract ("Amendment 2"). Amended contracts were also entered into in 2003 ("Amendment 3"), 2007 ("Amendment 4"), 2009 ("Amendment 5"), and 2012 ("Amendment 6," and together with the Initial Contract, and Amendments 1, 2, 3, 4, and 5, "FCR Contracts").

In addition to an extension of the contract term, Amendment 6 to the FCR Contracts included substantial modifications of definitions, as well as of the provisions governing Single Stream Recycling and the retrofitting by FCR of the Recycling Facilities to accommodate Single Stream Recycling. Despite these substantive changes, Amendment 6 maintained the arrangement, whereby the City would receive payments from FCR. In other words, Amendment 6 did not require the City to pay any funds to the recycling service. Specifically, Section 4.1 of Amendment 6 modified the Customer Fee agreement as follows:

On the Single Stream Start-up Date, Section 4.1 of the Agreement is hereby amended and restated in its entirety to read as follows:

(a) Commencing with the first Billing Period subsequent to the Single Stream Start-up Date and for each Billing Period thereafter, if the ACR in such billing Period exceeds the then Revenue Share Threshold, **the Company shall pay to the City a "Monthly Revenue Share"** equal to:

(ACR–the then Revenue Share Threshold) X .6 X RM

For example, if in a Billing Period the then Revenue Share

Threshold was $100, the ACR was $122 and the RM was 1,800, the Monthly Revenue Share for such Billing Period would be:

($122–$100) X .6 X 1,800 =
$22 X .6 X 1,800 =
$23,760

If the ACR is below the then Revenue Share Threshold, the **City will not receive a Monthly Revenue Share and shall not pay any supplemental processing fees.**

The Company shall provide the City with a detailed calculation of the ACR.

(b) If the ACR for any Billing Period is less than the then ACR Minimum, the Lost Revenue in such Billing Period will be calculated and carried forward on a cumulative basis. If and when the ACR exceeds the then Revenue Share Threshold in any Billing Period, the Company will retain for its own account the Monthly Revenue Share that would otherwise be payable to the City until there is no cumulative Lost Revenue, on a dollar-for-dollar basis. At that time, the Monthly Revenue Share will be paid to the City as otherwise called for in this Section 4.1.

(Emphases added). It is undisputed that, at no time during the term of the FCR Contracts, has the City made any monetary payments to FCR associated with the recycling services provided by FCR.[1]

After Appellants filed their complaint for declaratory judgment on September 24, 2012, the Appellees filed a motion to dismiss the complaint on November 26, 2012. The motion to dismiss was denied by order entered on February 28, 2013. On March 7, 2013, Appellees filed separate answers to the complaint.

On October 7, 2013, Appellants filed a motion for partial summary judgment, along with a statement of undisputed material facts and memorandum of law in support thereof. On December 10, 2013, Appellees filed separate motions for summary judgment. Also on

---

[1] The record reveals that, when the City first contemplated a recycling program, it believed that it would have to pay a vendor fee for this service. Because the City believed that it would have to pay money to a vendor to accept its recycling waste, the City originally advertised and sought requests for proposals.

December 10, 2013, Appellees filed a joint response to Appellants' motion for partial summary judgment, along with supporting documents.

The cross-motions for summary judgment were heard on February 11, 2014. By order of February 25, 2014, the trial court denied the Appellants' motion for summary judgment and granted Appellees' motion for summary judgment. As grounds for its holding, the trial court's order provides, in relevant part:

> 2) The primary question this Court has been asked by the parties to determine is whether the contract at issue in this proceeding involved an expenditure of funds as contemplated by the charter of the City of Memphis and the relative ordinances. This Court determines that the applicable City charter provisions and ordinance do not require competitive bidding unless there has been an expenditure of funds. The Court is of the opinion that if it was the intent of the ordinance that all contracts would be covered, then the City Council in its wisdom could make such a determination and not just limit it to contracts involving expenditures, but it could cover all contracts involving the City.
>
> 3) The Court is of the opinion that the term expenditure has a common meaning. Where a word or term has a common meaning, then the Court must interpret the same as it relates to its commonality. The Court is of the opinion that the term expenditure means the payment out of the resources of the City for a service to be rendered. In this case the Court is of the opinion that the contract at issue does not involve the payment by the City of any resources from the City's coffers for the service that's being rendered by FCR. Therefore, the Court is of the opinion that the contract before the Court does not involve the expenditure of funds and that the City and FCR are entitled to summary judgment on that basis and Plaintiffs' Motion for Partial Summary Judgment is denied for these same reasons.

Appellants appeal. They raise three issues for review as stated in their brief:

> 1. Whether the trial court correctly determined that the City's delivering its recyclable waste to FCR for processing does not constitute an expenditure as contemplated by the City Charter.

2. Whether the trial court correctly determined that the Code of Ordinances Sec[tion] 5-4-8 titled "Purchase of Goods and Supplies" does not broaden the definition of expenditure as it appears in the Memphis City Charter to include the delivery of recyclable waste for processing by FCR.

3. Whether the trial court correctly determined that the Material Amendment Doctrine does not apply to the contract at issue because the contract was not required to be competitively bid.

This case was decided upon grant of summary judgment. A trial court's decision to grant a motion for summary judgment presents a question of law. Our review is, therefore, *de novo* with no presumption of correctness afforded to the trial court's determination. ***Bain v. Wells***, 936 S.W.2d 618, 622 (Tenn. 1997). This Court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. ***Abshure v. Methodist Healthcare-Memphis Hosps.***, 325 S.W.3d 98, 103 (Tenn. 2010).

When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. According to the Tennessee Legislature:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
>
> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. § 20-16-101 (effective on claims filed after July 1, 2011).

This appeal requires interpretation of the FCA Contracts as well as the various charter, ordinance, code, and constitutional provisions set out above. In determining the proper interpretation to be given to a legislative act, we must employ the rules of statutory construction. The Tennessee Supreme Court recently reiterated the "familiar rules," stating:

Our role is to determine legislative intent and to effectuate legislative purpose. [*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn. 2010)]; *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009). The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose. *See Lee Med., Inc.*, 312 S.W.3d at 526; *Hayes v. Gibson Cnty.*, 288 S.W.3d 334, 337 (Tenn. 2009); *Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 176 (Tenn. 2008). When the language of the statute is clear and unambiguous, courts look no farther to ascertain its meaning. *See Lee Med., Inc.*, 312 S.W.3d at 527; *Green v. Green*, 293 S.W.3d 493, 507 (Tenn. 2009). When necessary to resolve a statutory ambiguity or conflict, courts may consider matters beyond the statutory text, including public policy, historical facts relevant to the enactment of the statute, the background and purpose of the statute, and the entire statutory scheme. *Lee Med., Inc.*, 312 S .W.3d at 527–28. However, these non-codified external sources "cannot provide a basis for departing from clear codified statutory provisions." *Id*. at 528.

*Mills v. Fulmarque*, 360 S.W.3d 362, 368 (Tenn. 2012).

Furthermore,

The Court has a duty to construe a statute so that no part will be inoperative, superfluous, void or insignificant. The Court must give effect to every word, phrase, clause, and sentence of the Act in order to achieve the Legislature's intent, and it must construe a statute so that no section will destroy another. [*Mangrum v. Owens*, 917 S.W.2d at 246; (quoting *Worrall v. Kroger Co.*, 545 S.W.2d 736, 738 (Tenn. 1977)) ] (citing *City of Caryville v. Campbell County*, 660 S.W.2d 510, 512 (Tenn. Ct. App. 1983); *Tidwell v. Collins*, 522 S.W.2d 674, 676 (Tenn. 1975)). The statute should be construed as a whole, and a particular section should not be read in isolation of the remainder of the statute. *State ex rel. McGhee v. St. John*, 837 S.W.2d 596, 604 (Tenn. 1992).

*State ex rel. Working v. Costa*, 216 S.W.3d 758, 769 (Tenn. Ct. App. 2006).

Likewise,

> When we interpret a contract, our role is to ascertain the intention of the parties. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). The intention of the parties is based on the ordinary meaning of the language contained within the four corners of the contract. *Kiser v. Wolfe*, 353 S.W.3d 741, 747 (Tenn. 2011); *see Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889–90 (Tenn. 2002). The interpretation of a contract is a matter of law, which we review de novo with no presumption of correctness. *Barnes v. Barnes*, 193 S.W.3d 495, 498 (Tenn. 2006).

*84 Lumber Co. v. Smith*, 356 S.W.3d 380, 382–83 (Tenn. 2011). Accordingly, it is the Court's function to interpret the contract as written according to its plain terms. *Petty v. Sloan*, 277 S.W.2d 355 (Tenn. 1955). The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc*., 521 S.W.2d 578 (Tenn. 1975)). In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79 (Tenn. Ct. App. 1983). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Sutton v. First Nat. Bank of Crossville*, 620 S.W.2d 526 (Tenn. Ct. App. 1981).

### "Expenditures"

In their first two issues, the Appellants argue that the City violated the law and its own competitive bidding requirements when, after entering into the Initial Contract with FCR in 1995, it entered into subsequent agreements, without competitively bidding the subsequent agreements. The gravamen of Appellants' argument is that the City's agreement with FCR required an "expenditure" so as to require competitive bidding under Article 7, section 51 of the Charter, *see supra*. As noted above, it is undisputed that the City has never paid any monies to FCR under the FCR Contracts. Accordingly, in support of their argument that the FCR Contracts are subject to competitive bidding procedures, Appellants offer two definitions of expenditure to support their argument that expenditures involve more than the payment of money. First, Appellants argue that an expenditure is "something expended, such as time or money;" thus, Appellant's definition of "expenditure" ostensibly seeks to define that term as "anything a party to a contract receives in the course of performing the contract that the party could possibly use to make a profit." In addition, Appellants contend that expenditure would include the "payment of cash or cash-equivalent." Appellants then argue

that the recyclable materials the City delivers to the FCR facility constitute "cash equivalents."

We first note that the Appellants have not provided this Court with any authority to support their contention that recyclable materials constitute cash equivalents. This is, perhaps, as our own research suggests, because there are no cases standing for that proposition. *Black's Law Dictionary* 245 (9th ed. 2009) defines a "cash equivalent" as "[a] short-term security that is liquid enough to be considered equivalent to cash." The Tennessee Code also defines "cash equivalents," for investment purposes, as "highly rated, highly liquid and readily marketable investments or securities with a remaining term to maturity of one (1) year or less, which includes money market funds. . . ." Tenn. Code Ann. § 56-3-302(7)(A). Considering the *Black's Law Dictionary* definition of "cash equivalent," along with the Legislature's definition of that term elsewhere in the Tennessee Code, we are unable to adopt Appellant's argument that recyclable materials constitute "cash equivalents" such that the City's rendering of its recyclable to the FCA facility would constitute an "expenditure" under the competitive bidding framework.

As noted above, Appellants' champion a broad definition of "expenditure" to include almost anything a party to a contract receives that it could possible use to make a profit. While we concede that the dictionary definition of "expend" is quite broad, including the expenditure of "time, money or physical effort, etc.," *see, e.g., Webster's Dictionary of the English Language* 332 (1989), *Black's Law Dictionary* 658 (9th ed. 2009), defines the term "expenditure" more narrowly as "1. The act or process of paying out; disbursement. 2. A sum paid out." Although we concede that the terms "expend," or "expenditure" may denote a disbursement of something other than money, our goal is to find and enforce the intent of the drafters of the City's competitive bidding process. Consequently, we must read the term (i.e., expenditure) in the context of the competitive bidding requirements contained in Article 7, section 51(1) of the Charter, *supra*. The Charter states, in relevant part that "[n]o contract involving an expenditure **exceeding ten thousand dollars ($10,000.00)**," shall be entered without the City engaging in the competitive bidding process. (Emphasis added). This qualifying (or, more aptly, limiting) phrase, i.e., "exceeding ten thousand dollars," indicates that the drafters were concerned with monetary expenditures made by the City. Had the drafters intended to apply the broadest definition of expenditure, they logically could have drafted the Charter without including any limitation on or definition of the term. However, because the drafters chose to describe expenditure in terms of monetary payments, we must give force and effect to that fact in our interpretation.

Although we find no cases in our jurisdiction that are directly on point (i.e., that define the term "expenditure" in the context of competitive bidding), we find guidance from two cases from our sister states. In ***Danis Clarkco Landfill Co. v. Clark Cnty. Solid Waste***

***Management District***, 653 N.E.2d 646 (Ohio 1995), the Ohio Supreme Court addressed a transaction similar to the one at issue in this appeal. In ***Danis***, Clark County Ohio awarded a recycling contract to Ogden Martin Systems, and a competing recycling contractor, Danis Clarkco filed suit, arguing that the county had violated its competitive bidding statutes. ***Id.*** at 650–51. In ***Danis***, Ogden Martin agreed to build and operate a waste disposal facility for the use of county residents. As in our case, the recycling contractor, Ogden Martin, agreed to pay the county a fee based on the tonnage of recycling materials it received. ***Id.*** at 650. Similar to our Appellants' argument, Danis argued that the contract amounted to an expenditure of funds because of the value of the facility the county had agreed to construct. ***Id.*** at 656. However, because the county was not required to make any monetary payments to Ogden Martin, the Ohio Supreme Court held that "the anticipated contract simply did not involve any monetary cost to the public or expenditure of public funds by the District." ***Id.*** at 655. Accordingly, the Ohio Supreme Court refused to find a violation of the bidding laws where there was not an "expenditure" or payment of government funds. ***Id***.

Likewise, the Washington Supreme Court, in the case of ***Organization to Preserve Agricultural Lands v. Adams County***, 913 P.2d 793 (Wash. 1996), held that Adams County was not required to seek competitive bids where the County entered into a mitigation agreement with a vendor. The disputed agreement in ***Adams County***, like the agreement at issue here, provided that the county would open a solid waste disposal facility, and that the vendor would provide the county "host fees" and other payments and free services. ***Id.*** at 797. Like our case, the Adams County vendor paid fees to the county, as opposed to the county paying (or expending) funds to the vendor. The Washington Supreme Court concluded that competitive bidding was not required for a contract involving payments to a county and the acquisition of free goods and services because the contract involved no expenditure on the part of the county. ***Id***. at 806–07.

While we find the instant case analogous to both ***Danis*** and ***Adams County***, Appellants argue that the case should be governed by the New York Court of Appeals case of ***Signacon Controls v. Mulroy***, 298 N.E.2d 670 (N.Y. 1973). In ***Signacon***, the New York Court of Appeals addressed the question of whether a transaction between the County of Onondaga and a private vendor constituted a gift or a contract, and whether the transactions terms constituted an expenditure greater than one thousand dollars. Interstate, a private vendor, offered to supply Onondaga County with a central fire alarm control center in exchange for the ability to charge a fee for each connecting transmitter sold to a non-county purchaser and Onondaga County's agreement to promote such transmitters to non-county purchasers. ***Id.*** at 671. The transaction was not competitively bid and the competitor sued to enforce the competitive bidding statute. The New York court first held that the transaction constituted a contract, rather than conditional gift. It then turned to the question of whether the contract fell within the language of the competitive bidding statute, which required all

purchase contracts involving one thousand dollars or more to be competitively bid. The court determined that the contract should have been competitively bid because the contract's terms required Onondaga County to pay charges ranging between $1,525.00 and $1,820.00 for each transmitter. *Id.* at 672–73. After reaching its decision on the merits of the underlying contract, the **Signacon** Court briefly discussed the definition of "expenditure" in its effort to distinguish the case from the case of **Hauger v. Earl**, 90 N.Y.S.2d 637 (Ny. App. Div.1949), which the **Signacon** Court considered to be contradicting authority. *Id.* at 673–74. We do not find the holding in **Signacon** persuasive in this appeal. First, the **Signacon** Court did not address the definition of "expenditure" except in *dictum*. *See id.* at 673. Regardless, the New York Court did not expand the definition of expenditure, but rather explained that the definition of expenditure is based upon policy decisions regarding the benefit of competitive bidding and the burden placed on the County in requiring such a contract to be competitively bid. Furthermore, the holding in **Signacon** is based upon New York law, which is not at issue, or controlling, in the instant appeal. Accordingly, we are not persuaded by the reasoning in **Signacon** to reach the same result in this case.

Appellants further contend that a broader definition of expenditure is necessary to protect against fraud, collusion, or favoritism. Specifically, Appellants suggest that this Court "not lose sight of the context in which this dispute arises. Competitive bidding . . . prevents collusion or fraud and guards against favoritism." In the first instance, there is no allegation of fraud or collusion in this case. Furthermore, the City, in its discretion, has chosen to limit competitive bidding to only those contracts for services that involve an "expenditure." As previously discussed, in order to avoid unnecessarily expanding its common, dictionary definition, we have concluded that the term "expenditure" must be construed as requiring a monetary expenditure. *See generally **Myers v. AMISUB (SFH), Inc.**, 382 S.W.3d 300, 311 (Tenn. 2012) (noting that dictionary definitions may be used to determine how terms are "commonly defined"). It is not the purview of this Court to enlarge legislative intent, nor do we engage in advisory opinions. "In an interlocutory appeal, as well as in an appeal as of right, the appellate court considers only questions that were actually adjudicated by the trial court." **Shaffer v. Memphis Airport Authority, Serv. Mgmt. Sys., Inc.**, No. W2012-00237-COA-R9-CV, 2013 WL 209309, at *4 (Tenn. Ct. App. Jan.18, 2013) (citing **In re Estate of Boykin**, 295 S .W.3d 632, 636 (Tenn. Ct. App. 2008) ("At the appellate level, we are limited in authority to the adjudication of issues that are presented and decided in the trial courts."). "To do otherwise would render the interlocutory appeal a request for an advisory opinion." **Shaffer**, 2013 WL 209309, at *4.

Based upon the foregoing discussion, we decline to expand the definition of "expenditure," as used in the competitive bidding procedure, to include the City's tendering of recyclable materials to FCR.

## "Involving" more than $50,000.00

As an alternate argument, Appellants contend that because the FCR Contracts involve more than $50,000.00, the FCR Contracts were subject to competitive bidding pursuant to Ordinance Section 5-8-8(C)(1):

> Notwithstanding any other provision of the Charter or this Code, no contract for equipment, apparatus, **material**, supplies, goods or **services** for the city involving more than $50,000.00 shall be made except after the contract shall have been [competitively bid].

(Emphasis added). Appellants argue that the Ordinance applies not only to contracts for goods, but also to contracts for "material" and "services." Thus, Appellants contend that recycling services and the delivery of recyclable materials under the contract plainly fall within the scope of the Ordinance. As correctly noted by Appellants, the foregoing Ordinance does not contain the word "expenditure." Appellants argue that this Ordinance expanded Article 7, section 51(1) of the Charter to require competitive bidding of all contracts, including not only revenue expenditure contracts, but also contracts that are revenue generating.

There are several problems with Appellants' argument. First, the expenditure provision at issue is governed by the Memphis City Charter, rather than simple ordinance. Amendments to home rule charter must be approved by referendum election by the voters. *See* Tenn. Const. art. XI, § 9 (2014); *see also* Tenn. Code Ann. § 2-5-151 (establishing the procedure for a referendum for the purposes of, *inter alia*, amending a charter). In their reply brief, Appellants do not dispute that Ordinance Section 5-8-8(C)(1) was not approved by referendum election. Thus, it simply cannot amend the Charter's specific language requiring competitive bidding only for contracts involving "expenditures."

Further, Section 51 of the Charter was amended by Home Rule Amendment Ordinance No. 4434 to allow the Memphis City Council to adjust the dollar amount for purchases. Specifically, Home Rule Amendment Ordinance No. 4434 provides that: "the City Council by ordinance *may adjust the limits* for purchases and newspaper advertisement for competitive bidding and the purchase orders therefor." (Emphasis added). It appears that, in enacting Ordinance 5-4-8, the City Council was, in fact, increasing the threshold amount of purchases that were subject to competitive bidding procedures (i.e., the Ordinance increases the threshold amount from $10,000.00 to $50,000.00). Nothing in Home Rule Amendment Ordinance No. 4434, however, allows the Memphis City Council to delete the Charter's requirement that competitive bidding only applies to contracts involving

"expenditures." Consequently, contrary to Appellants' contention, the Ordinance could not have expanded or amended Article 7, section 51(1) of the Charter in any aspect other than the threshold amounts. Thus, the requirement that competitive bidding only applies to those contracts that involve an "expenditure" remains in place in spite of Ordinance Section 5-8-8(C)(1).

## Material Amendment Doctrine

It is undisputed that the City has not paid any monies in connection with the FCR Contracts. From the record, however, it appears that when the City first contemplated a recycling program, it believed that it might have to pay a fee to a vendor for these services. For this reason, the City initially advertised for competitive bidding because of its belief that an expenditure would be required. During the bidding process, however, the City learned that vendors would not charge the City a fee if it delivered its recyclable waste to the facility. Instead, the City was paid for its recyclables; thus, the Initial FCR contract was not, in fact, subject to the competitive bidding procedures. Accordingly, the subsequent amendments to the Initial Contract, were not subject to the competitive bidding process because none of the amendments required the City to expend monies for the recycling service. *See **BSG, LLC v. Check-Velocity, Inc.***, 395 S.W.3d 90 (Tenn. 2012) (holding that each amendment to a contract that includes new terms and conditions constitutes a new and separate contract).

As Appellants' note in their brief, the City's Purchasing Manual states, in relevant part:

> A competitively-procured contract cannot be renewed without rebidding unless the original contract contains a renewal provision . . . .

In addition, the Appellants cite the case of ***Browning-Ferris Industries of Tennessee, Inc. v. City of Oak Ridge***, 644 S.W.2d 400 (Tenn. Ct. App. 1982) to support their argument that "a contract subject to competitive bidding may not be extended without competitive bidding absent an express provision permitting extension . . . ." In ***Browning-Ferris***, the City of Oak Ridge, pursuant to its competitive bidding ordinance, entered into a contract for garbage services with Tennessee Industrial Disposal ("TID"). *Id.* at 401. Although not specifically stated by this Court, implicit in the ***Browning-Ferris*** Opinion is that Oak Ridge was paying or expending city funds to have TID pick up trash and waste. At the conclusion of the original contract term, Oak Ridge advertised for vendors to submit bids on a new contract for these services; however, Oak Ridge ultimately rejected all bids in favor of continuing with TID. The lower bidder then filed suit against Oak Ridge, alleging violation of its competitive bidding requirements. *Id.* Oak Ridge and TID challenged the lower bidder on

-15-

two grounds: (1) whether the lower bidder had standing to file suit; and (2) whether the contract's negotiation provision allowed Oak Ridge the right to extend the duration of the contract or merely authorized further negotiations. *Id*. at 401–403.

The instant case differs significantly from the ***Browning-Ferris*** case. In ***Browning-Ferris***, it is undisputed that the underlying contract was initially subject to Oak Ridge's competitive bidding procedures; here, although the City believed that the Initial Contract was subject to competitive bidding, ultimately the contract was not because it did not involve an expenditure of funds by the City. Furthermore, it is undisputed that none of the amendments to the Initial Contract required the City to expend funds. Accordingly, the ***Browning-Ferris*** case is not specifically applicable to the instant appeal. Instead, because neither the Initial Contract, nor any of the subsequent amendments, required the City to make a monetary expenditure, the contracts were simply not subject to competitive bidding.

For the foregoing reasons, we affirm the order of the trial court. The case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of the appeal are assessed against the Appellants, Rock-Tenn Converting Company and Talisha Haynes, and their respective sureties.

_____
J. STEVEN STAFFORD, JUDGE

-16-